698 A.2d 581

**Bobbi Jo WELSH, as Administratrix of the Estate of Kyle A. Gaines, Deceased, and Bobbi Jo Welsh, in her own right, Appellant,**

v.

**Donald W. BULGER, M.D., Claysburg Medical Associates, Inc. and Nason Hospital, Appellees.**

Supreme Court of Pennsylvania.

Submitted July 19, 1996.

Decided July 23, 1997.

506

James F. Mundy, Frank DePasquale, Jr., Philadelphia, for Bobbi Jo Welsh.

Stephen L. Dugas, Hollidaysburg, for Nason Hospital.

John W. Blasko, State College, for Bulger/Claysburg Medical Association.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

OPINION OF THE COURT

NEWMAN, Justice.

This appeal concerns claims for corporate negligence by Appellant, Bobbi Jo Welsh, against Appellee, Nason Hospital, which emanated from the delivery of her son, Kyle A. Gaines, now deceased. The Court of Common Pleas of Blair County (trial court) granted summary judgment in favor of Nason Hospital and dismissed the hospital. The Superior Court affirmed. We now reverse and remand for further proceedings.

## FACTS AND PROCEDURAL HISTORY

In 1989, Welsh, then sixteen years of age, received prenatal care from Donald W. Bulger, M.D., and his practice at Claysburg Medical Associates, Inc. At that time, Dr. Bulger had obstetrical privileges at Nason Hospital but these privileges did not permit him to perform surgery at the hospital.

At approximately 4:00 a.m. on January 1, 1990, Welsh began experiencing contractions. She arrived at Nason Hospital at approximately noon and the nursing staff conducted an initial internal examination, which revealed that Welsh's cervix was dilated five centimeters and that her membranes were intact. Dr. Bulger first examined Welsh at 7:55 p.m. and performed an amniotomy,[1] which produced meconium stained fluid.[2] He also placed an internal monitoring device on the fetus to monitor the fetal heart rate.

Welsh's cervix became fully dilated at 8:15 p.m. and Dr. Bulger instructed her to begin pushing out the baby. By 9:13 p.m., the fetal monitoring device indicated that the fetal heart rate had experienced consecutive nonassuring variable deceleration patterns, suggesting possible interference of umbilical

---

[1]. An amniotomy is an "[a]rtificial rupture of the fetal membranes as a means of inducing or expediting labor." Stedman's Medical Dictionary 62 (26th ed.1995).

[2]. Meconium is the "first intestinal discharges of the newborn infant, greenish in color and consisting of epithelial cells, mucus, and bile." Id. at 1074.

blood flow to the fetus. The fetal monitoring device continued to show nonassuring variable deceleration patterns until approximately 9:38 p.m., when monitoring was discontinued.

At approximately 9:50 p.m., Welsh was transferred to the delivery room. Dr. Bulger vaginally delivered the child with forceps at approximately 10:35 p.m. Following the delivery, the child was dusky in color, was lacking in muscle tone, was without spontaneous respiration, and had a low heart rate. The child had Apgar scores of four at one minute after delivery and six at five minutes after delivery.[3] At approximately 11:25 p.m., the child was transferred to Altoona Hospital for additional care. After the child was released from Altoona Hospital, he suffered numerous complications and required several hospitalizations. On November 27, 1990, the child died at the age of eleven months.

Welsh filed a complaint, individually and on behalf of the estate of her child, against Dr. Bulger, Claysburg Medical Associates, Inc., and Nason Hospital.[4] The claims against Nason Hospital are couched in negligence and are premised on separate theories of vicarious liability and direct liability. First, Welsh alleges that Nason Hospital is vicariously liable for the negligent acts of its staff in failing to monitor and to respond to an infant showing signs of fetal distress. Second, Welsh alleges that Nason Hospital is directly liable for its own negligence because it granted non-surgical obstetrical privileges to Dr. Bulger without requiring a qualified surgeon to be available in case surgery was necessary and because its staff failed to notify the hospital that Welsh's child needed a surgical delivery.

During discovery, Welsh produced the reports of three expert witnesses to support her claims against the defendants. The first expert, Dr. Warren E. Cohen, M.D., opined that

3. Apgar scores are an evaluation of a newborn infant's physical status by assigning numerical values (zero to two) to each of five criteria: heart rate, respiratory effort, muscle tone, response to stimulation, and skin color. *Id.* at 1585. A total score of eight to ten indicates the best possible condition. *Id.*

4. Dr. Bulger and Claysburg Medical Associates, Inc. are not parties to this appeal.

Welsh's child suffered severe brain injuries at birth, which were more than likely caused by the combined effects of hypoxia,[5] ischemia,[6] acidosis,[7] and the resultant cerebral edema.[8] Dr. Cohen concluded that the child's death eleven months later was the result of the injuries sustained at birth.

The second expert, Dr. Marshall E. Klavan, M.D., also concluded that the child's injuries at birth resulted in the child's death. Dr. Klavan explained that the presence of nonassuring variable deceleration patterns on the fetal monitoring readout indicated that the umbilical cord had become compressed and the fetus was not receiving sufficient blood flow. He opined that such a readout dictated that monitoring should not have been discontinued at 9:38 p.m. and that a surgical delivery, either vaginally or abdominally, should have been performed. Dr. Klavan concluded that "this infant's permanent injuries relate to intrapartum asphyxia which would have been avoided had Dr. Bulger adhered to the accepted standards of obstetrical practice."

The final expert, Stanley M. Warner, M.D., agreed that the fetal monitoring readout evidenced a need for a surgical delivery. His report, which is addressed to Welsh's counsel, provides as follows:

> I have reviewed the materials you sent me regarding the care of Bobbi Jo Welsh. I find that her care was below the standard of care.

**5.** Hypoxia is a "[d]ecrease below normal levels of oxygen in inspired gases, arterial blood, or tissue, short of anoxia." Stedman's Medical Dictionary 841 (26th ed.1995).

**6.** Ischemia is "[l]ocal anemia due to mechanical obstruction (mainly arterial narrowing) of the blood supply." *Id.* at 894.

**7.** Acidosis is a "state characterized by actual or relative decrease of alkali in body fluids in relation to the acid content; depending on the degree of compensation for the [acidosis], the pH of body fluids may be normal or decreased; an accumulation of acid metabolites often is present, and tissue function may be disturbed (most importantly that of the central nervous system), if compensation is inadequate." *Id.* at 15.

**8.** Cerebral edema is "brain swelling due to increased volume of the extravascular compartment from the uptake of water in the neuropile and white matter." *Id.* at 544.

At about 20:30 hours on January 1, 1990, recurrent late decelerations or variable decelerations with late components appear consistently on the fetal monitor record. Bobbi Jo Welsh did not deliver Kyle Allan Welsh [sic] until 22:35 hours on January 1, 1990. There was no reason to believe at 20:30 hours that there would be rapid delivery of Kyle. Bobbi Jo Welsh was a 16 year old prima gravida and her labor was progressing approximately normally for a prima gravida. By that estimate, it would have been at least two more hours before one would have expected delivery from the 20:30 hour time, which, of course, is what did happen. In fact, that is rather on the rapid side. The nurses must have known what was going on. An internal scalp led [sic] was placed on 7:55 a.m. There was oxygen from 9:30 p.m. or 21:30 hours.

It is apparent from Dr. Bulger's deposition that he was not qualified to perform cesarean sections and failed to have anyone in that could perform cesarean sections. He also did no consultation for cesarean section. If Dr. Bulger had arranged for an appropriate cesarean section or the hospital had arranged for an appropriate cesarean section with the nurses' input on this, there is every reason to believe that Kyle Allan Welsh [sic] would be an absolutely normal child today. There also should have been a pediatrician available for the resuscitation and there was not.

On October 27, 1993, Nason Hospital filed a motion for summary judgment, arguing that there was no issue to be tried concerning its liability because Welsh's expert reports failed to support her claims against the hospital. After oral argument, the trial court granted Nason Hospital's motion for summary judgment on the vicarious liability and direct liability claims and dismissed Nason Hospital from this action. On appeal, the Superior Court adopted the trial court's reasoning and affirmed the entry of summary judgment in favor of Nason Hospital. We granted allocatur to address the issue of what type of evidence is necessary to establish a *prima facie* claim of corporate liability for negligence against a hospital

pursuant to our decision in *Thompson v. Nason Hospital*, 527 Pa. 330, 591 A.2d 703 (1991).[9]

## DISCUSSION

A court should grant summary judgment only where it is clear from the pleadings and the evidence presented that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Marks v. Tasman*, 527 Pa. 132, 589 A.2d 205 (1991) (citing Pa.R.C.P. 1035(b)).[10] Summary judgment is appropriate only in those cases where the right is clear and free from doubt. *Id.* When deciding a motion for summary judgment, a court must view the record in the light most favorable to the nonmoving party and must resolve all doubts concerning the existence of a genuine issue of material fact against the moving party. *Id.*

In *Thompson*, this Court first adopted the theory that a corporation, specifically a hospital, can be held directly liable for negligence. We explained the concept of corporate negligence as follows:

> Corporate negligence is a doctrine under which the hospital is liable if it fails to uphold the proper standard of care owed the patient, which is to ensure the patient's safety and well-being while at the hospital. This theory of liability creates a nondelegable duty which the hospital owes directly to a patient.

*Thompson*, 527 Pa. at 339, 591 A.2d at 707. Under *Thompson*, a hospital has the following duties:

> (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce

9. Welsh did not appeal the entry of summary judgment concerning her claims based on vicarious liability.

10. Pa.R.C.P. 1035 was rescinded effective July 1, 1996, and replaced by Pa.R.C.P. 1035.1 through 1035.5.

adequate rules and policies to ensure quality care for the patients.

*Id.* at 339–40, 591 A.2d at 707 (citations omitted).

"Because the duty to uphold the proper standard of care runs directly from the hospital to the patient, an injured party need not rely on the negligence of a third-party, such as a doctor or nurse, to establish a cause of action in corporate negligence." *Moser v. Heistand,* 545 Pa. 554, 558, 681 A.2d 1322, 1325 (1996). Instead, corporate negligence is based on the negligent acts of the institution. *Moser.* A cause of action for corporate negligence arises from the policies, actions or inaction of the institution itself rather than the specific acts of individual hospital employees. *Id.* Thus, under this theory, a corporation is held directly liable, as opposed to vicariously liable, for its own negligent acts.

To establish a claim for corporate negligence against a hospital, a plaintiff must show that the hospital had actual or constructive knowledge of the defect or procedures that created the harm. *Thompson.* The plaintiff also must establish that the hospital's negligence was a substantial factor in causing the harm to the injured party. *Id.*

Although we set forth the elements of a cause of action for corporate negligence against a hospital in *Thompson,* we did not address the type of evidence necessary to prove this cause of action. In a traditional medical malpractice action, where the defendant's negligence is not obvious, a plaintiff must present expert testimony to establish to a reasonable degree of medical certainty that the defendant's acts deviated from an accepted medical standard, and that such deviation was the proximate cause of the harm suffered.[11] *Mitzelfelt v. Kamrin,* 526 Pa. 54, 584 A.2d 888 (1990); *Hamil v. Bashline,* 481 Pa. 256, 392 A.2d 1280 (1978). The Common-

11. Expert testimony is not required "where the matter under investigation is so simple, and the lack of skill or want of care so obvious, as to be within the range of the ordinary experience and comprehension of even nonprofessional persons." *Chandler v. Cook,* 438 Pa. 447, 451 n. 1, 265 A.2d 794, 796 n. 1 (1970); *see also Brannan v. Lankenau Hosp.,* 490 Pa. 588, 417 A.2d 196 (1980).

wealth Court has determined that this expert testimony requirement is equally applicable to claims of corporate negligence where the hospital's negligence is not obvious. *Walls v. Hazleton State Gen. Hosp.*, 157 Pa. Commw. 170, 629 A.2d 232 (1993). We believe the Commonwealth Court's determination is sound, and accordingly, we hold that, unless a hospital's negligence is obvious, a plaintiff must produce expert testimony to establish that the hospital deviated from an accepted standard of care and that the deviation was a substantial factor in causing the harm to the plaintiff. We do not, however, require experts to use "magic words" when expressing their opinions. *Mitzelfelt.* Instead, we look at the substance of their testimony. *Id.* With these standards in mind, we now examine Welsh's claims for corporate negligence.[12]

In support of her claims for corporate negligence, Welsh relies on the expert report of Dr. Warner. She first claims this report establishes that the hospital was corporately negligent for the failure to monitor and report the child's condition, which is a violation of the duty to oversee all persons who practice medicine within its walls as to patient care, the third duty under *Thompson.*[13] Read in the light

12. We note that Welsh filed a reproduced record with her brief. This reproduced record contains a copy of the deposition transcripts of Dr. Bulger and Patricia Harpster, R.N., a nurse of Nason Hospital who was present during the birth of Welsh's child. These transcripts, however, were not included in the official record filed with the Prothonotary's office. Accordingly, consideration of such evidence by this Court would be improper since the transcripts have never properly been made part of the official record. *McCaffrey v. Pittsburgh Athletic Association*, 448 Pa. 151, 162, 293 A.2d 51, 57 (1972) (appellate court cannot consider anything which is not part of the record); *see also Mid–Island Properties, Inc. v. Manis*, 391 Pa.Super. 236, 570 A.2d 1070 (1990) (documents not part of the record should not be included in the reproduced record and will not be considered on appeal).

13. As we explained in *Thompson,*

[i]t is well established that a hospital staff member or employee has a duty to recognize and report abnormalities in the treatment and condition of its patients. If the attending physician fails to act after being informed of such abnormalities, it is then incumbent upon the hospital staff member or employee to so advise the hospital authorities so that appropriate action might be taken. When there is a failure to report changes in a patient's condition and/or to question a physician's order which is not in accord with standard medical

most favorable to Welsh as the nonmoving party, the report shows that Dr. Warner opined that the nurses breached the standard of care because they must have known that there was a problem with the delivery but failed to act on that knowledge. Dr. Warner concluded that this breach was a substantial factor in bringing about the harm to the deceased when he concluded that if the nurses had notified the hospital of the need for a cesarean section, then the injury would not have occurred. Thus, Dr. Warner's report is sufficient to support a *prima facie* claim of corporate negligence for Nason Hospital's failure to oversee all persons who practice medicine within its walls as to patient care. *Thompson; Walls.*

 Welsh's second claim for corporate negligence is that the hospital granted Dr. Bulger obstetrical privileges, knowing that he was not competent to perform surgery, and then failed to require a qualified surgeon to be available during Dr. Bulger's deliveries when it knew those deliveries might require surgery. Welsh couches this claim both as a violation of the hospital's duty to select and retain only competent physicians, the second duty under *Thompson,* and as a violation of the hospital's duty to formulate and enforce policies to ensure quality care, the fourth duty under *Thompson.* Read in the light most favorable to Welsh, Dr. Warner's report indicates that the hospital breached the standard of care by not arranging for a qualified surgeon to perform a cesarean section. Dr. Warner also opined that the hospital's failure to arrange for a cesarean section was a substantial factor in causing the harm to the deceased because if "the hospital had arranged for an appropriate cesarean section with the nurses' input on this, there is every reason to believe that Kyle Allan Welsh would be an absolutely normal child today." Therefore, Dr. Warner's report is also sufficient to establish a *prima facie* claim of corporate negligence against the hospital for failure to retain only competent physicians and for failure to formulate

practice and the patient is injured as a result, the hospital will be liable for such negligence.
*Thompson,* 527 Pa. at 342–43, 591 A.2d at 709 (citations omitted).

and enforce policies to ensure quality care. *Thompson; Walls.*

We reverse the Order of the Superior Court and remand this case to the trial court for proceedings consistent with this Opinion.

CASTILLE, J., files a concurring and dissenting opinion.

FLAHERTY, C.J., files a dissenting opinion.

CASTILLE, Justice, concurring and dissenting.

I concur with the majority's holding that a plaintiff must present expert testimony in order to establish a *prima facie* case of corporate liability against a hospital pursuant to *Thompson v. Nason Hospital*, 527 Pa. 330, 591 A.2d 703 (1991), unless the hospital's negligence is obvious. I nevertheless dissent here because I believe that the plaintiff/appellant has failed to present sufficient expert evidence for purposes of surviving summary judgment on the corporate liability claims asserted against appellee, Nason Hospital.

Initially, I note that like the majority, I believe that appellant suffered a tragic loss when her son died approximately eleven months after he was born. Also, I agree with the majority's statement that experts are not required to use "magic words" when expressing their opinions. However, in order for appellant to defeat Nason Hospital's motion for summary judgment, appellant must still produce a proper expert report to support her two claims of corporate liability. My review of appellant's two corporate liability claims and her three expert reports leads me to the conclusion that appellant has not presented sufficient evidence to defeat Nason Hospital's motion for summary judgment on either of the two claims of corporate liability.

Appellant first claims that when viewing her expert reports as a whole and in a light most favorable to her case, a material issue of fact exists as to her theory of negligence that Nason Hospital is corporately liable because its employees did not recognize and report the abnormalities in the delivery of appellant's child to the hospital so that Nason Hospital could

have taken the appropriate action to prevent the harm suffered. A *prima facie* case for this claim of corporate liability involves a showing that a hospital employee had a duty to recognize and report abnormalities in the treatment of a patient, that the hospital employee should have informed the attending physician of the abnormality and that the hospital employee should have informed the hospital of the abnormality when the attending physician failed to act so that the hospital could have taken corrective action. *Thompson,* 527 Pa. at 342–43, 591 A.2d at 709.

In this case, appellant presented three expert reports to support her theories of liability. The two expert reports of Warren E. Cohen, M.D. and Marshall Klaven, M.D. were not critical in any way of the hospital or its personnel for failing to obtain a surgical consult. However, the expert report of Dr. Warner stated that "the nurses must have known what was going on ... If Dr. Bulger had arranged for an appropriate cesarian section or the hospital had arranged for an appropriate cesarian section with the nurses' input on this, there is every reason to believe that Kyle Allan Welsh would be an absolutely normal child today."

The majority here seizes upon the words that the "nurses should have known what was going on" to establish that the nurses had a duty to recognize the problem, inform Dr. Bulger of the problem and that they should have informed the hospital of Dr. Bulger's failure to act so that the hospital could have arranged a cesarian section and avoided the injury. I believe that such a reading of appellant's expert report strains itself beyond viewing the evidence in a light most favorable to appellant in order to conclude that appellant's expert report created a *prima facie* case of corporate liability.

Instead, I believe that when appellant's expert report is viewed in a light most favorable to appellant as the non-moving party, the bare allegation of Dr. Warner that the hospital nurses "must have known" a problem had arisen is simply insufficient since it fails to elucidate the proper standard of care the hospital and its nurses owed to appellant, how the hospital and its nurses breached this duty by failing to

recognize that Dr. Bulger's actions were so far removed from acceptable medical practice that the hospital authorities should have been informed, and how this breach caused the harm suffered by appellant. *See Mitzelfelt v. Kamrin*, 526 Pa. 54, 62, 584 A.2d 888, 891 (plaintiff in medical malpractice required to produce medical expert who will testify to a reasonable degree of medical certainty that physician's acts deviated from the appropriate standard of care and the deviation was the cause of the injury); *Menarde v. Philadelphia Transportation Co.*, 376 Pa. 497, 501, 103 A.2d 681, 684 (1954) (expert must testify that in his professional opinion that the result in question came from the cause alleged by plaintiff; "[A] less direct expression of opinion falls below the required standard of proof and does not constitute legally competent evidence"). Because these omissions in appellant's expert reports go beyond the mere failure to use "magic words," I conclude that appellant, who bears the burden of proof at trial, has failed to produce evidence of facts essential as a matter of law to establish a *prima facie* case of corporate negligence against Nason Hospital under *Thompson*. Accordingly, I would affirm the Superior Court's order affirming the entry of summary judgement in favor of Nason Hospital based on this particular assertion of corporate negligence.

Appellant's second claim is that her expert reports create a material issue of fact as to her theory that Nason Hospital is corporately liable for granting obstetrical privileges to Dr. Bulger without limiting the exercise of his privileges to circumstances where surgical expertise was readily available in the event that surgery was needed. Like the previous claim of corporate liability, the majority holds that a reading of Dr. Warner's expert report in a light most favorable to appellant is sufficient to establish a *prima facie* case of corporate liability concerning the failure to limit Dr. Bulger's obstetrical privileges to circumstances where surgical expertise was available in case of complications. In particular, the majority finds that Dr. Warner's expert report, which stated that if "the hospital had arranged for an appropriate cesarian section with the nurses' input on this, there is every reason to believe that

Kyle Allan Welsh would be an absolutely normal child today," is sufficient to establish that the hospital had a duty to have a policy requiring a surgical consultant to be available where obstetrical privileges are limited and that the hospital's failure to either have or follow such a policy resulted in the child's death. Once again, I believe the majority strains itself beyond viewing the evidence in a light most favorable to appellant in order to conclude that appellant presented sufficient expert evidence to support this theory of corporate liability.

Here, the evidence clearly shows that Dr. Bulger was not qualified to perform surgery and that Nason Hospital did not grant Dr. Bulger surgical privileges. However, none of the expert evidence presented suggested that Nason Hospital was negligent in granting Dr. Bulger privileges because he was generally incompetent. Instead, the expert reports state that Dr. Bulger departed from acceptable medical practice by choosing not to undertake a surgical consult and a surgical delivery. Also, none of appellant's expert reports set forth what standard of care Nason Hospital owed to its patients by not having another physician available to provide a consult, whether it was reasonable for a hospital to have such a policy in place requiring a physician with Dr. Bulger's limited obstetrical privileges to consult with a surgeon about whether to perform a cesarian section and whether Nason Hospital should have known that such a policy was necessary to comply with a reasonable standard in conducting the hospital's functions. Moreover, appellant's expert reports, even when read in a light most favorable to appellant, fail to opine that the hospital's failure to either have or to follow such a policy was the proximate cause of the injuries suffered. Thus, by these omissions in appellant's expert reports, I conclude that appellant fails in her burden to establish a *prima facie* case of corporate negligence against Nason Hospital. Therefore, I would also affirm the Superior Court's order affirming the trial court's entry of summary judgment in favor of Nason Hospital on this issue.

Accordingly, while I agree that expert testimony is necessary to establish a *prima facie* case of corporate liability

against a hospital, I believe that the expert testimony offered by appellant in this case was insufficient to defeat Nason Hospital's motion for summary judgment. Therefore, I must respectfully dissent from the majority's reversal of the Superior Court's affirmance of the Blair County Court of Common Pleas order granting summary judgment in favor of Nason Hospital.

FLAHERTY, Chief Justice, dissenting.

I would affirm the superior court's decision upholding the trial court's entry of summary judgment in favor of Nason Hospital. Further, I express my continuing opposition to this court's creation of such a novel concept as "corporate liability," which is in every sense of the term an anomaly to established concepts of liability under respondeat superior. I make reference to my dissenting opinion in *Thompson v. Nason Hospital*, 527 Pa. 330, 591 A.2d 703 (1991).