Sybil **MATTHEWS** and Robert Matthews, her Husband, Appellants,

v.

**CLARION HOSPITAL, A Corporation and David A. Buffone.**

Superior Court of Pennsylvania.

Argued June 22, 1999.

Filed Dec. 8, 1999.

Mark E. Milsop, Pittsburgh, for appellant.

John A. Bass, Pittsburgh, for appellee.

Before KELLY, FORD ELLIOTT, and BROSKY, JJ.

FORD ELLIOTT, J.

¶ 1 This is an appeal from the trial court's order entering summary judgment in favor of defendant/appellee Clarion Hospital ("hospital"). The trial court treated this case as if it were a traditional medical malpractice case and required appellants to provide a medical expert who would opine to a reasonable degree of medical certainty that hospital's acts deviated from an acceptable medical standard and that such deviation was the proximate cause of appellant Sybil Matthews' harm. When appellants failed to provide an expert report on the issue of causation in a timely fashion, the court entered summary judgment.

¶ 2 We find, however, that this is a case of corporate negligence, not medical malpractice. *See Thompson v. Nason Hospital*, 527 Pa. 330, 591 A.2d 703 (1991). Nevertheless, a claim of corporate negligence, like a claim of medical malpractice, requires that in cases where a hospital's negligence is not obvious, a plaintiff must establish through expert testimony that a hospital's acts deviated from an accepted standard of care and that the deviation was a substantial factor in causing plaintiff's harm. *Welsh v. Bulger*, 548 Pa. 504, 512–14, 698 A.2d 581, 585 (1997). Expert testimony is not, however, required to establish a breach of duty " 'where the matter under investigation is so simple, and the lack of skill or want of care so obvious, as to be within the range of the ordinary experience and comprehension of even nonprofessional persons.' " *Id.* at n. 11, 698 A.2d at 585 n. 11, quoting *Chandler v. Cook*, 438 Pa. 447, 451 n. 1, 265 A.2d 794, 796 n. 1 (1970). *See also Brannan v. Lankenau Hospital*, 490 Pa. 588, 417 A.2d 196 (1980).

¶ 3 Nor is expert testimony as to *causation* required "where there is an *obvious* causal relationship" between the injury complained of and the alleged negligent act. *Lattanze v. Silverstrini*, 302 Pa.Super. 217, 448 A.2d 605, 608 (1982) (emphasis in original), citing *Smith v. German*, 434 Pa. 47, 253 A.2d 107 (1969). "An obvious causal relationship exists where the injuries are either an 'immediate and direct' or the 'natural and probable' result of the alleged negligent act." *Lattanze*, 448 A.2d at 608, quoting *Tabuteau v. London Guarantee & Accident Co., Ltd.*, 351 Pa. 183, 40 A.2d 396 (1945) (other citation omitted). Because we find that in this case, Sybil Matthews' injuries were the immediate and direct result of hospital's

alleged negligent act, we also find that the trial court erred when it required appellants to establish causation to a reasonable degree of medical certainty through medical expert testimony. As a result, we vacate the summary judgment and remand. The factual and procedural history of the case necessary to understanding its resolution follows.

¶ 4 On September 10, 1993, after giving birth to a healthy baby, Sybil Matthews ("patient") underwent a tubal ligation at hospital.[1] David A. Buffone, M.D., also named as a defendant in this case, performed the operation.[2] In October 1995, patient filed a complaint in which she alleged that "[d]uring or incident to the aforementioned procedure ... the Defendants caused and/or allowed the patient to fall from the operating table upon which she was placed by said Defendants, ...." thereby injuring her right arm and shoulder. (R.R. at 8a, 11a.)

¶ 5 During the course of discovery, hospital requested that patient identify individuals she intended to call as experts; however, by March 17, 1997, when patient still had not provided the names of the experts she intended to call, hospital filed a motion for sanctions. On April 7, 1997, the court held a hearing on the motion for sanctions. In its order addressing the motion, the court indicated that the parties had discussed several issues, including the need for expert testimony as to causation, but that the issue was not properly before the court; therefore the court would not rule on it. (R.R. at 83a.) Nevertheless, the court invited either party to

bring the issue before the court with an appropriate motion. (*Id.*) The court then ordered patient within 45 days to identify expert witnesses she intended to call and to provide hospital with copies of the expert reports, and instructed patient that if she did not comply, she would be precluded from introducing any expert testimony. In response, patient timely filed the expert report of Mary Rodgers Schubert, R.N., directed to the standard of care of operating room nurses, but did not file a report addressing the issue of causation.

¶ 6 On August 11, 1998, patient filed her pre-trial statement, which listed as experts whose reports had been forwarded to counsel for defendants Nurse Schubert and Glenn A. Buterbaugh, M.D.[3] At a pre-trial conference held on August 17, 1998, the parties argued the issue whether patient was required to submit a medical expert report on causation in order to establish a *prima facie* case of negligence. The trial court ordered patient to file such a report, prepared by one of the physicians already identified to hospital, within 20 days.[4] No such report having been filed, hospital filed a motion for summary judgment on September 23, 1998. In the motion, hospital claimed it was entitled to summary judgment because patient had not established a *prima facie* case of negligence, having failed to file an expert report opining to a reasonable degree of medical certainty that hospital deviated from acceptable standards of care and that such deviation was the proximate cause of patient's injuries. (R.R. at 142a–144a, cit-

1. Plaintiff Robert Matthews, patient's husband, claimed loss of consortium in the complaint. For ease of discussion, however, we will refer to plaintiffs in the singular as "patient."

2. Dr. Buffone's motion for summary judgment was granted, thereby dismissing him from the case. (R. at 70.) Patient does not appeal from that order.

3. Dr. Buterbaugh had filed a report in 1994 in which he did not discuss the cause of patient's injury, instead observing that she

noted severe shoulder pain upon awakening after surgery. (R.R. at 126a.) In his notes from the 1994 examination, however, he observed that patient admitted she fell off the operating room table and that her right arm was stretched by the nurse pulling on it. (R.R. at 125a.)

4. The court granted the extension because counsel who attended the pre-trial hearing was not the same counsel who had attended the hearing on the motion for sanctions, although both worked for the same law firm.

ing *Mitzelfelt v. Kamrin*, 526 Pa. 54, 584 A.2d 888 (1990).)

¶ 7 Patient then filed a brief in opposition to the motion, claiming that the reports prepared by her treating physicians established the requisite degree of causation. (R.R. at 161a–162a.) She also claimed that she had attempted to comply with the court's August 1998 order by repeatedly contacting Dr. Buterbaugh, who finally prepared a report, dated September 23, 1998, which patient appended to her brief. Additionally, patient claimed that her counsel had consulted with an orthopedic surgeon, Lawrence Honick, M.D., who had reviewed patient's medical history and who would opine that patient's injuries were caused by her fall from the operating table. Patient therefore requested that the court consider Dr. Buterbaugh's appended report, and also that the court permit patient to file an expert report prepared by Dr. Honick. (R.R. at 160a–166a.)

¶ 8 On January 6, 1999, the trial court entered summary judgment against patient, opining that "[t]he plaintiff in a medical malpractice case is required to present an expert witness who will testify, to a reasonable degree of medical certainty, that the defendant deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered." (Trial court opinion, 1/6/99 at 4, citing *Mitzelfelt, supra* at 62, 584 A.2d at 892.) The court also recognized, however, that the requirement of expert testimony regarding causation is not absolute:

> '[W]here "the disability complained of is the natural and probable result of the injuries, the fact-finding body may be permitted to so find, even in the entire absence of expert opinion." The two must be 'so closely connected and so readily apparent that a layman could

diagnose (except by guessing) the causal connection.'

Trial court opinion, 1/6/99 at 4, quoting *Smith v. German, supra* at 51, 253 A.2d at 109, quoting *Florig v. Sears, Roebuck & Co.*, 388 Pa. 419, 424, 130 A.2d 445, 447 (1957), citing *Tabuteau, supra*. Nevertheless, the court, which *did* consider Dr. Buterbaugh's report appended to patient's brief, concluded that in this case, medical expert testimony *was* essential and Dr. Buterbaugh's report was inadequate. As the court opined:

> Dr. Buterbaugh's report does not state to a reasonable degree of medical certainty that [patient's] alleged fall from the operating table was a substantial factor in bringing about her injuries. To the contrary, it states that 'the exact etiology of her [condition] is uncertain.' Dr. Buterbaugh's uncertainty and his enumeration of possible causes for [patient's] condition makes it clear that this is not a case where a layman could diagnose (except by guessing) the causal connection.

Trial court opinion, 1/6/99 at 5. The court then denied patient's request that she be permitted to file an expert report prepared by Dr. Honick, citing its April 7, 1997 order as dispositive of that issue.[5] (*Id.*) As a result, the court entered summary judgment against patient, and this timely appeal followed.

¶ 9 On appeal, patient raises one issue: "Whether the trial court erred in dismissing the plaintiffs' claims pursuant to a motion for summary judgment where it had denied the plaintiffs the opportunity to establish causation through the testimony of a non-treating physician." (Appellants' brief at 3.)[6] *See* Pa.R.Civ.P. 1035.2(2). Underlying this issue is patient's claim that she was unaware until the pre-trial conference on August 17, 1998 that the reports of her treating physicians

---

5. That order was docketed April 17, 1997.

6. According to a footnote in her brief on appeal, patient never produced or filed Dr. Honick's report. (Appellant's brief at 15 n. 3.)

were inadequate for that purpose. (Appellants' brief at 7, 12, 13.)

When presented with a challenge to an order granting summary judgment, we view the record in the light most favorable to the non-moving party, resolving all doubts as to the existence of a genuine issue of material fact against the moving party. *Ertel v. Patriot–News Company*, 544 Pa. 93, 674 A.2d 1038 (1996). Concerning questions of law, our scope of review is plenary. *Id.* We are not bound by a trial court's conclusions of law; instead, we may draw our own inferences and reach our own conclusions. *Butterfield v. Giuntoli*, 448 Pa.Super. 1, 670 A.2d 646 (1995), *appeal denied*, 546 Pa. 635, 683 A.2d 875 (1996).

*Borden, Inc. v. Advent Ink Co.*, 701 A.2d 255, 258 (Pa.Super.1997).

¶ 10 The Rules of Civil Procedure governing motions for summary judgment provide that after the relevant pleadings are closed, a party may move for summary judgment:

if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action ... which in a jury trial would require the issues to be submitted to a jury.

Pa.R.Civ.P. 1035.2(2), 42 Pa.C.S.A.

■ ¶ 11 In order to establish a *prima facie* case of corporate negligence, the plaintiff must show that a hospital breached its duty (1) to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) to select and retain only competent physicians; (3) to oversee all persons who practice medicine within its walls as to patient care; or (4) to formulate, adopt, and enforce adequate rules and policies to ensure quality care for patients. *Welsh, supra* at 512–14, 698

A.2d at 585, quoting *Thompson, supra* at 339–340, 591 A.2d at 707 (citations omitted). A plaintiff must also establish that the hospital's negligence was a substantial factor in causing the harm suffered. *Welsh, supra* at 512–14, 698 A.2d at 585, citing *Thompson.*

¶ 12 To establish her *prima facie* case, plaintiff relied on Nurse Schubert's report to establish the standard of care for operating room nurses and a breach of that standard when a patient falls from an operating table. *See Flanagan v. Labe*, 446 Pa.Super. 107, 666 A.2d 333, 335 (1995) (a nurse may testify as to the applicable standard of care for nurses and to a breach of that standard of care so long as he or she is permitted by law to perform the acts in question and has in fact done those acts or is familiar with them), citing *Taylor v. Spencer Hospital*, 222 Pa.Super. 17, 292 A.2d 449, 453 (1972).

¶ 13 To establish causation, patient provided the medical records of her treating physicians. These records reflect that patient experienced significant right shoulder pain either when she awoke from surgery or almost immediately thereafter.[7] (R.R. at 97a–136a.) Dr. Buterbaugh's notes of December 12, 1994 indicate that patient "admitted that she fell off OR table and RUE [right upper extremity] was stretched by nurse pulling on it." (R.R. at 125a.) His report of December 14, 1994 indicates that patient "noted the onset of severe right shoulder pain upon awakening after surgery following a general anesthetic." (R.R. at 126a.) Nurse Schubert's report describes the incident giving rise to the onset of shoulder pain as one during which nursing personnel had difficulty transferring patient from one OR stretcher to another, and to keep her from falling pulled on her right arm. (R.R. at 170a.) Nurse Schubert's report further indicates that when patient was admitted to the hospital, all of her extremities were found

---

7. All of the medical records and reports indicate that patient suffered a right long thoracic neuropathy, or nerve palsy.

to be in normal condition. (*Id.*) Progress notes from physical therapy indicate that patient reported she awoke from surgery without pain, but that she lost her balance while trying to get up from the litter to go to the bathroom, "and one of the nurses at the hospital tried to protect her, caught her by the arm to keep her from falling, and she notes that this kept her from falling but she had immediate right shoulder pain after this...." (R.R. at 135a.) Finally, in his September 23, 1998 report, Dr. Buterbaugh reiterates that description of the incident and then opines:

[T]he exact etiology of her serratus anterior palsy is uncertain. Causes of a serratus anterior palsy can include a traumatic injury such as a fall or it can be related to operative positioning. There are also viral etiologies as well as a series of patients post partum that develop a long thoracic nerve palsy. There is also a certain group of patients who develop a long thoracic nerve palsy spontaneously.

There does appear to be a strong association between her traumatic event and the subsequent long thoracic nerve palsy.

R.R. at 169a.

¶ 14 We agree with the trial court that Dr. Buterbaugh's reports do not rise to the degree of certainty necessary to establish causation in those cases in which medical expert testimony is necessary. Unlike the trial court, however, we conclude that this is a case in which the injury "is so immediately and directly, or naturally and probably, the result of the accident that the connection between them does not depend solely on the testimony of professional or expert witnesses." *Tabuteau, supra* at 185–87, 40 A.2d at 398, citing *Davis v. Davis*, 80 Pa.Super. 343 (1923) (other citation omitted).

¶ 15 Our conclusion is buttressed by our review of this court's analysis in *Lattanze, supra*. In *Lattanze*, plaintiff was involved in an automobile accident during which he was thrown about inside his vehicle.

Within six hours, he developed pain in his neck, back, and shoulder muscles as well as a severe headache. He was subsequently diagnosed with a concussion and with various injuries to the affected areas of his upper body, which required treatment for almost eight months and also prevented him from working. At the close of the evidence, however, the trial court entered a directed verdict for the defendant because plaintiff's treating physician testified merely that plaintiff's physical problems were consistent with the injuries he sustained in the accident; he did not testify that in his professional opinion, the plaintiff's physical problems were caused by the accident. *Lattanze*, 448 A.2d at 607.

¶ 16 On appeal, the *Lattanze* court first reviewed those cases in which a Pennsylvania appellate court determined that the injuries complained of were either "immediate and direct" or the "natural and probable" result of the alleged negligent act; therefore expert medical testimony was unnecessary to prove causation. *Id.* at 608 (collecting cases). *See also Mohr v. Desimone and Sayers*, 110 Pa.Super. 44, 167 A. 504 (1933) (no medical expert testimony necessary to establish causal link between plaintiff's falling into a ditch and his spinal cord hemorrhage where evidence indicated plaintiff had been steadily employed doing heavy manual labor prior to the accident but required canes to walk after the accident, and where physician testified that spinal cord hemorrhage is frequently seen in shocks and contusions and that accident was the most logical cause in plaintiff's case); *Stracka v. Mosko*, 99 Pa.Super. 463 (1930) (no medical expert testimony necessary to establish whether a blow to plaintiff's lower abdomen with a metal pipe aggravated a congenital defect thereby necessitating surgery to repair a hernia, where undisputed evidence indicated that before the incident, plaintiff was a strong, healthy 20–year–old male doing heavy manual labor, while shortly after defendant struck him, plaintiff was doubled over

with pain and required immediate medical attention and surgery, and where his physician testified that the blow might have aggravated his congenital condition). As the *Lattanze* court observed, all of the cases possessed two common characteristics: the manifestation of the injury began almost immediately after the alleged negligent act, and the injury complained of was the type one would reasonably expect to result from the accident in question. *Id.*

¶ 17 Next, the *Lattanze* court reviewed those cases in which no obvious causal relationship existed; therefore expert medical testimony was found to be necessary. *Id.* at 608–609 (collecting cases). In these cases, either a significant period of time had elapsed between the injury complained of and the accident or the injury was not of the type one would normally expect to result from the accident in question, either because the accident would not normally produce such an injury or because there were other equally likely or more likely causes of the injury. *Id.* at 609.

¶ 18 After reviewing the two lines of cases, the *Lattanze* court reversed the trial court, observing that viewing the record in the light most favorable to the plaintiff, the jury could have concluded that there was an obvious causal relationship between the accident and plaintiff's neck, back, head, and shoulder injuries, especially where plaintiff suffered from none of these physical symptoms prior to the accident. *Id.*

¶ 19 We also find helpful this court's analysis in *McDonald v. Aliquippa Hospital*, 414 Pa.Super. 317, 606 A.2d 1218 (1992). In that case, plaintiff, who was a patient at defendant hospital, was injured while being transported by wheelchair through hospital's corridors. Plaintiff's foot, which was protruding straight out in front of him due to a malfunction in the wheelchair leg rest, got caught in a set of automatic doors when they malfunctioned.

The nurse who was transporting him attempted to pull his foot through the doors, thereby causing the doors to close more tightly.

¶ 20 Plaintiff and his wife filed a complaint against hospital alleging improper maintenance of the doors and negligence of the nurse in failing to exercise due care. The trial court entered a compulsory nonsuit against plaintiff, and this court reversed, finding that under the rule of *res ipsa loquitur*, plaintiff's case should have gone to the jury. As the *McDonald* court opined, "Where a relatively helpless patient is being moved through the corridors of a hospital by an employee of the hospital, a jury can infer that injuries caused to the patient by automatic doors were the result of hospital negligence." *Id.* at 1221.[8] The *McDonald* court further observed that "[t]o establish a prima facie case of negligence, it was not necessary that plaintiffs' evidence exclude all other causes of the accident." *Id.* As that court noted, " '[a]ll that is required is that appellant present a case from which a jury may reasonably conclude that the negligence was, more probably than not, that of the defendant. Restatement (Second) of Torts § 328 D comment f.' " *Id.*, quoting *Smith v. City of Chester*, 357 Pa.Super. 24, 515 A.2d 303, 305–306 (1986).

¶ 21 Like the plaintiff in *McDonald*, patient in this case was helplessly dependent on the care of hospital staff at the time she was injured. Also like plaintiff in *McDonald*, patient in this case presented evidence that she was injured when hospital staff breached their duty of care to her. Furthermore, like the plaintiff in *Lattanze* and the cases it relied upon, patient in this case immediately or almost immediately experienced pain, in this case in her arm and shoulder, after the incident in question. Also like plaintiff in *Lattanze* and cases cited therein, prior to the alleged

---

8. There is no indication in *McDonald* that plaintiff introduced *any* medical testimony to establish causation.

incident, in this case the fall from ·the operating table, patient was a healthy 28–year–old woman with no prior history of upper body pain or disability. After the incident in question, patient, like plaintiff in *Lattanze*, was unable to function as before and had objectively verifiable injuries, in patient's case to her arm and shoulder. Both also underwent sustained periods of treatment following the incident in question. Additionally, patient's treating physician, like the treating physician in *Lattanze*, testified that patient's injuries were consistent with a traumatic injury of the type suffered, in her case a fall, although neither testified that the physical problems were caused by the incident. Patient's treating physician did opine additionally, however, that "[t]here does appear to be a strong association between [patient's] traumatic event and the subsequent [injury]." (R.R. at 169a.) Thus, we find that in this case, like those cases relied upon by the *Lattanze* court, "[t]he accident and the injury were so closely connected, and so quickly apparent, that the circumstances themselves justified the submission to the jury." *Tabuteau, supra* at 185–87, 40 A.2d at 398.

¶ 22 Judgment vacated. Case remanded for further proceedings consistent with this opinion. Jurisdiction relinquished.