IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Housing Authority of the County of   :
Armstrong                              :
                                    :
        v.                   : No.  1413 C.D. 2022
                                    : Submitted: December 4, 2023
Joseph S. Gluz,                  :
               Appellant  :

OPINION NOT REPORTED

MEMORANDUM OPINION
PER CURIAM                                FILED:  January 19, 2024

Joseph S. Gluz (Tenant) appeals from the August 29, 2022 order of the Court of Common Pleas of Armstrong County (trial court) entering judgment on the Housing Authority of the County of Armstrong's (Housing Authority) complaint in ejectment and breach of contract in favor of the Housing Authority following a non-jury trial. On appeal, Tenant argues the trial court's decision was not supported by sufficient evidence and the trial court erred in determining he violated the terms of his lease with the Housing Authority. Upon review, we affirm.

## I.    Background

On December 12, 2017, Tenant executed a Residential Dwelling Lease Agreement (Lease) with the Housing Authority to rent an apartment in the Garden Towers Apartment Complex (Garden Towers). Original Record (O.R.),[1] Item No.

---

[1] Tenant's reproduced record contains only excerpted portions of hearing transcripts. *See generally* Reproduced Record. On June 12, 2023, the Housing Authority filed an application for
**(Footnote continued on next page…)**

5, Ex. A at 1-21. Relevant to this appeal, the Lease contains the following provisions:

### K. RESIDENT OBLIGATIONS

Resident agrees to:

. . . .

(10) not engage in, and cause family members, guests, other persons on the premises with Resident's consent and other persons under Resident's control to not engage in any criminal activity or drug related criminal activity on or off the premises. Drug related activity is the illegal manufacture, sale, distribution, use or possession of a controlled substance, or the possession of drug paraphernalia;

(11) act, and cause family members, guests, other persons on the premises with Resident's consent and other persons under Resident's control to act, in a cooperative manner with [Housing Authority] staff and other persons residing in or on property belonging to or controlled by [the Housing Authority], and refrain from acting or speaking in an abusive or threatening manner toward [Housing Authority] staff and other persons residing in or on property belonging to or controlled by [the Housing Authority];

. . . .

### R. TERMINATION OF AGREEMENT

---

dismissal in this Court, arguing Tenant failed to file and serve a designation of the contents of the reproduced record, in violation of Pennsylvania Rule of Appellate Procedure 2154(a), Pa.R.A.P. 2154(a). The Housing Authority also argued Tenant's reproduced record did not comply with Rule of Appellate Procedure 2152(a), Pa.R.A.P. 2152(a), because it did not contain the relevant docket entries. The Housing Authority also objected to the reproduced record because it omitted relevant portions of the trial transcript and the Housing Authority lacked the ability to correct the omissions due to Tenant's failure to designate the contents of the reproduced record. By order dated July 11, 2023, this Court denied the Housing Authority's application for dismissal, noting the Housing Authority did not suffer any prejudice because "the Court has the original record to examine in its review." Therefore, we have reviewed the original record and will cite to it exclusively.

> This agreement may be terminated by [the Housing Authority] only for a violation of a material term of this agreement . . . . Violations of material terms of this agreement include, but are not limited to:
>
> . . . .
>
> (10) any illegal or other activity, including but not limited to disorderly behavior or alcohol abuse by [Tenant] . . . which interferes with the health, safety, or the right of peaceful enjoyment of other persons residing in, on, or in the immediate vicinity of property belonging to or controlled by [the Housing Authority] or [its] staff;

*Id.* at 7-8, 14-15.

On August 25, 2021, the Housing Authority served Tenant with a letter (Termination Notice) notifying him that it was terminating his Lease due to Tenant's failure to comply with numerous Lease provisions, including the Resident Obligations found in Section K (10) and K (11). O.R., Item No. 5, Ex. B. The Termination Notice also informed Tenant he needed to vacate his apartment within 30 days or face eviction proceedings. *Id.* Tenant did not vacate his apartment,[2] and the Housing Authority initiated eviction proceedings in the local magisterial district court. O.R., Item No. 5 at 3. On December 9, 2021, the local district court entered judgment in favor of the Housing Authority and against Tenant, granting the Housing Authority possession of the apartment and awarding damages in the amount of $169.25. O.R., Item No. 1.

On December 20, 2021, Tenant appealed the local district court's judgment to the trial court. *Id.* On August 24, 2022, the trial court held a bench trial on Tenant's

---

[2] Instead, Tenant filed a grievance under the Housing Authority's grievance policy. Pursuant to Section R of the Lease, "[w]hen [Tenant] invokes the grievance procedure involving a termination/vacate notice, the [Housing Authority] shall not enforce the request to vacate until after final disposition of the grievance." O.R., Item No. 5, Ex. A at 16. The Housing Authority was, however, permitted to file an eviction action after the expiration of the 30-day notice period. *Id.* Since the grievance process took more than 30 days to complete, the Housing Authority filed its eviction action while it was still processing Tenant's grievance. *See* O.R., Items No. 1-5.

appeal. *See generally* T.T. 8/24/22.[3] At trial, the Garden Towers' property manager (Property Manager) testified and explained the Garden Towers has 98 apartment units which are occupied by low-income elderly and disabled individuals. *See id.* at 10-11. The Garden Towers also has one smoking and one non-smoking outdoor pavilion, each with picnic tables, for its residents' use and enjoyment. *Id.* at 20. After receiving reports of incidents involving Tenant and reviewing Tenant's file, Property Manager wrote the Termination Notice and served it on Tenant. *Id.* at 15-17.

Property Manager explained that the Housing Authority provided Tenant with three written notices to remove his personal grill and smoker from the non-smoking pavilion in June and July of 2019. T.T. 8/24/22 at 21-22. When Tenant did not comply, the Housing Authority was forced to cut the chains Tenant placed on the items in order to remove them. *Id.* at 21-25. Property Manager also explained Tenant was provided written notice that he violated the Lease when he engaged in verbal altercations with other residents. *See id.* at 23. Finally, Property Manager showed the trial court several documents the Kittanning Borough Police Department (Police Department) provided to the Housing Authority indicating the Police Department charged Tenant with harassment, and Tenant ultimately pled guilty. *Id.* at 26, 34. Property Manager opined that Tenant engaged in "repeated, disruptive behavior" which made the other residents feel unsafe. *Id.* at 35-36.

Donald Blose (Officer Blose), a police officer for the Police Department, testified that the police have responded to numerous incidents involving Tenant. T.T. 8/24/22 at 42-43. Officer Blose explained that several residents expressed they were

---

[3] "T.T. 8/24/22" refers to the transcript of the bench trial in this matter, which the Honorable Chase G. McClister conducted on August 24, 2022. Although this transcript was included with the trial court's original record, it was not given an item number.

going to move out of the Garden Towers to get away from Tenant. *Id.* at 45. Officer Blose filed charges of harassment and disorderly conduct against Tenant for three separate incidents. *Id.* at 45-47. Officer Blose also opined that many of the problems with Tenant stemmed from him "aggressively approaching people on Garden Towers' property telling them to wear a mask." *Id.* at 49.

Shannon Atherton (Atherton), whose mother resides at the Garden Towers, testified about witnessing Tenant's aggressive behavior. T.T. 8/24/22 at 56-57. On June 17, 2021, Atherton watched Tenant approach the front of the building, look at the non-smoking pavilion, realize someone else was in the pavilion, act "like Terminator," march to the other resident, and inform the other resident the pavilion was his spot and that the other resident needed to leave. *Id.* at 58. Tenant demanded, multiple times, that the other resident leave, "pounding his fists on the table like an angry child." *Id.* at 59. The other resident left, and Tenant would not permit him to sit anywhere outside, yelling until the other resident completely left the area. *Id.* Tenant then went to the smoking pavilion and demanded a second resident give Tenant the second resident's food stamp card. *Id.* at 59-60. When the second resident shook his head no, Tenant said "[k]eep it up. Keep it up or you know what you are going to get." *Id.* at 60.

Donna D. Myers (Myers), a resident at the Garden Towers, testified Tenant threatened her on an elevator on June 26, 2021. T.T. 8/24/22 at 64. Myers explained the incident occurred after she got on the Garden Towers' small elevator and Tenant rushed in behind her. *Id.* at 65. The ride started out normally, until Tenant bragged about a new, five-layered face mask and Myers did not respond. *Id.* at 66. Tenant then "got extremely enraged at [Myers]," and began chanting about how someone was going to kill her because she was not vaccinated. *Id.* at 66-67. Myers explained

Tenant then began "violently shaking his arm, his great big fist and his index finger in my face." *Id.* at 67. Tenant then stopped, waited approximately twenty seconds, and did the same thing a second time. *Id.* at 67-68. Myers was terrified and believed Tenant would hurt or kill her on this elevator ride. *Id.* at 68-69. Myers requested to be moved to a different building after the incident and was still fearful of Tenant at the time she testified before the trial court. *Id.* at 68-70.

Frankie Wolmeldorf (Wolmeldorf), a former resident of the Garden Towers, testified that Tenant followed him around constantly and made him feel uncomfortable. T.T. 8/24/22 at 74, 76-77. Wolmeldorf moved out of the Garden Towers because of Tenant's behavior. *Id.* at 78.

Joseph Boston (Boston), a resident of Garden Towers, testified Tenant has threatened him for years and will not leave him alone. T.T. 8/24/22 at 81. Boston recalled one specific incident that occurred at a nearby grocery store. *Id.* Boston drove to the grocery store and Tenant, who was riding his bicycle, followed Boston into the grocery store parking lot. *Id.* at 82. Tenant got off his bicycle and told Boston "[y]ou are nothing but an asshole and I am going to beat the shit out of you." *Id.* Tenant then "started picking his bicycle up and slamming it up and down and using a bunch of profanity." *Id.* Tenant ultimately returned to the Garden Towers without physically assaulting Boston. *Id.* On multiple other occasions, Boston witnessed Tenant stand beside another resident who is terminally ill with liver cancer and mock her, saying "whoa, whoa. My liver is hurting." *Id.* at 83. Noting that Tenant is very strong, Boston explained that he lives in fear for his life and health because he does not have a safe place to live. *Id.* at 83-84.

The Housing Authority's Executive Director (Executive Director) testified that she was the hearing officer for Tenant's appeal of the Termination Notice under

6

the Housing Authority's grievance policy. T.T. 8/24/22 at 88-89, 93. The Executive Director explained that after she heard testimony in Tenant's grievance appeal of the Termination Notice, she concluded

> the residents were clearly fearful of living in the building. Again, they referred to [Tenant] as a bully on the playground and felt that he pr[e]yed on those who were most vulnerable in the building. . . . The majority of residents are either elderly and/or disabled. They are all low income. Most of them don't have anywhere else to go, so they [are] fearful of losing their home.
>
> In my opinion, the evidence at that point established that [Tenant] had, in fact, engaged in serious and repeated violations of the [L]ease, mainly concerning the safety of the other residents.

*Id.* at 92-93. Executive Director confirmed she upheld the Termination Notice and denied Tenant's request for relief under the Housing Authority's grievance policy. *Id.* at 93.

Tenant testified on his own behalf. *See* T.T. 8/24/22 at 103-54. Tenant denied any wrongdoing for each incident the Housing Authority's witnesses testified about and gave his own version of the facts for some of the incidents. *Id.* at 109-29. Tenant showed the trial court security camera footage, which did not have any sound, of two of the incidents in question. *Id.* at 130-38. On cross examination, Tenant admitted he was in the army, is 6′ 2″ tall, weighs 235 pounds, and lifts weights regularly at a local gym. *Id.* at 138-39.

When questioned about why the Housing Authority's witnesses all testified to facts which contradicted his testimony, Tenant asserted the other residents are part of a conspiracy against him. *Id.* at 144. Tenant also asserted the Police Department and the Housing Authority are part of this conspiracy. *Id.* at 147. Tenant stated there were two reasons for the conspiracy: jealousy and politics. *Id.* at 148. With

7

respect to politics, Tenant asserted the conspirators were "anti-vaxxers and anti-mask and . . . politically on the far right." *Id.* With respect to jealousy, Tenant claims he "won numerous art contests and [is] a self-taught artist" who has about 45-50 paintings in his room. *Id.* at 150. Tenant also claimed that "some [of his paintings] are worth $10,000." *Id.* Despite this claim, Tenant admitted he only ever sold one piece of his artwork – for $40. *Id.* at 150-51.

After reviewing the evidence, the trial court issued the following brief findings of fact:

1. [Tenant] did not cooperate with the reasonable requests of [the] Housing Authority staff regarding the grill and smoker at the pavilion in violation of Paragraph K (11) of the [Lease].

2. [Tenant] did engage in criminal activity off the premises, which resulted in a guilty plea, in violation of Paragraph K (10) of the [Lease].

3. [Tenant] did speak in an abusive manner towards one or more persons residing in [the Garden Towers] in violation of Paragraph K (11) of the [Lease].

O.R., Item No. 14. The trial court entered judgment in favor of the Housing Authority. *See id.* In the trial court's opinion filed under Pennsylvania Rule of Appellate Procedure 1925(a), Pa.R.A.P. 1925(a), the trial court explained it based its finding of fact on its conclusion the Housing Authority's witnesses were credible and "Tenant's blanket denials of any improper behavior were not credible." O.R., Item No. 23 at 5.

Tenant appealed the trial court's order to this Court.[4] On appeal, Tenant argues the trial court based its decision on insufficient evidence, and the trial court

---

4    Tenant originally appealed to the Superior Court. However, by order filed November 10, 2022, the Superior Court transferred the matter to this Court.

8

committed legal errors in determining he violated Section K (10) and K (11) of the Lease.

## II. Analysis

Our review of a non-jury trial verdict is limited to determining whether substantial evidence supports the findings of the trial court and whether the trial court committed an error in applying the law. *See Pottstown Sch. Dist. v. Montgomery Cnty. Bd. of Assessment Appeals*, 289 A.3d 1142, 1145 n.3 (Pa. Cmwlth. 2023) (citation omitted). We must give the trial judge's findings of fact "the same weight and effect on appeal as the verdict of a jury." *Id.* (citation omitted). "We consider the evidence in a light most favorable to the verdict winner . . . and will reverse the trial court only if its findings of fact are not supported by [substantial] evidence in the record." *Id.* (citation omitted). When the issue "concerns a question of law, our scope of review is plenary," meaning we look at the entire record. *Id.*

### A. Substantial Evidence

We begin with Tenant's argument the trial court's findings are not supported by substantial evidence. Tenant believes two of the Housing Authority's witnesses could not have been credible because security camera footage of the incidents contradicts their testimony. First, we note Tenant acknowledged the security camera footage did not include any sound. *See* T.T. 8/24/22 at 149. Second, we note the trial court did not admit the security camera footage into evidence because Tenant failed to include it in his pretrial statement. *See id.* at 153-55. Because the trial court did not admit the security camera footage into evidence, we cannot consider it in determining whether the trial court's determination was based upon sufficient evidence. *See* Pa.R.A.P. 1921 (providing that only original papers, exhibits, and

transcripts filed in the trial court and certified docket entries "shall constitute the record on appeal"); *Welsh v. Bulger*, 698 A.2d 581, 586 n.12 (Pa. 1997) (appellate courts cannot consider any matter which is not part of the record on appeal).

To the extent Tenant argues the trial court watched the security camera footage and those observations, combined with his testimony, should outweigh the Housing Authority's witnesses' contradictory testimony, we reject Tenant's argument. In addition to observing the security camera footage, the trial court observed Tenant and the Housing Authority's witnesses as they explained what was happening during the incidents in question. The trial court determined the Housing Authority's witnesses were credible and Tenant was not credible. We will not disturb the trial court's credibility and weight of the evidence determinations on appeal. *See Rice v. Compro Distrib., Inc.*, 901 A.2d 570, 574 (Pa. Cmwlth. 2006) ("The trial court, as the finder of fact, has exclusive authority to weigh the evidence, make credibility determinations, and draw reasonable inferences from the evidence presented.").

Considering the evidence, which is summarized above, in the light most favorable to the Housing Authority as the verdict winner, we conclude the record contained substantial evidence supporting the trial court's determination. Therefore, we reject Tenant's argument that the trial court's findings are not supported by substantial evidence.

**B. Section K (11) of the Lease**

Tenant also argues the trial court's factual findings do not support its legal conclusion that Tenant violated Section K (11) of the Lease because the terms "cooperative," "abusive," and "threatening" in Section K (11) of the Lease are vague. *See* Appellant's Br. at 13. We construe a contract "according to the meaning

10

of its language. The fundamental rule in construing a contract is to ascertain and give effect to the intention of the parties. The intention of the parties must be ascertained from the document itself, if its terms are clear and unambiguous." *Empire Sanitary Landfill, Inc. v. Riverside Sch. Dist.*, 739 A.2d 651, 654 (Pa. Cmwlth. 1999).

We disagree with Tenant's belief that Section K (11) of the Lease is ambiguous and not clear. Tenant's behavior, which made other Garden Towers residents live in fear, was abusive, threatening, and not cooperative to his fellow residents under any definition of those terms. Section K (11)'s plain language, which reflects the Housing Authority's intention for its residents to be cooperative and respectful toward the Housing Authority staff and other residents, supports this conclusion. Accordingly, we reject Tenant's argument the trial court erred in concluding Tenant violated Section K (11) of the Lease.[5]

### III. Conclusion

Substantial evidence supports the trial court's factual findings, and the trial court properly concluded Tenant violated Section K (11) of the Lease. Because this violation alone entitled the Housing Authority to evict Tenant, we affirm the trial court's August 29, 2022 order entering judgment in favor of the Housing Authority on its complaint in ejectment and breach of contract.

---

[5] Because we affirm the trial court's decision to grant the Housing Authority's complaint and eject Tenant on the grounds that Tenant violated Section K (11) of the Lease, we need not evaluate Tenant's argument that the trial court's factual findings do not support its legal conclusion that Tenant also violated Section K (10) of the Lease. Nevertheless, we note that Section K (10) does not clearly establish whether all off-premises criminal activity or only off-premises drug-related criminal activity violates the Lease.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Housing Authority of the County of : 
Armstrong :
 :
v. : No. 1413 C.D. 2022
 :
Joseph S. Gluz, :
Appellant :


**PER CURIAM**               **O R D E R**


    **AND NOW**, this 19th day of January 2024, the Court of Common Pleas of Armstrong County's August 29, 2022 order is hereby **AFFIRMED**.