# Whittington v. Episcopal Hospital

450

*Emmanuel O. Iheukwumere,* for plaintiffs.
*Anna Bryan,* for defendant.

ACKERMAN, *J.,* February 3, 2000—After an eight-day jury trial, the jury, inter alia, found in favor of the plaintiff, Jackie P. Whittington, administratrix of the estate of Claudette E. Milton, deceased, and Kadijah Nicole Woods, in her own right, against the defendant, Episcopal Hospital, in the total sum of $1,100,000, made up as follows: wrongful death action, $200,000; survival action, $900,000. The jury apportioned liability, inter alia, as follows: defendant, Episcopal Hospital, 15 percent directly liable for corporate liability, and 10 percent for vicarious liability. The verdict was molded against defendant, Episcopal Hospital, as follows:

For the plaintiffs and against defendant, Episcopal Hospital, in the total sum of $275,000, made up as follows: $50,000 as to wrongful death and $225,000 as to the survival action.

Defendant, Episcopal Hospital, filed a motion for post-trial relief in the nature of a judgment n.o.v. and reduction of the 15 percent in its pro rata share of the verdict and motion for new trial.

The sole issue raised by defendant, Episcopal Hospital, is that the finding of corporate liability was not warranted under the law or the evidence.

After argument and hearing, this court denied defendant's, Episcopal Hospital's, motion for post-trial relief, and the instant appeal followed.

This case is about the death of plaintiffs' decedent, Claudette Milton, from the medical condition known as preeclampsia, also known as toxemia, or PIH, which stands for pregnancy-induced hypertension. Defendant, Dr. Carol Allen, followed Ms. Milton during her prenatal care period. During Ms. Milton's prenatal care, she was also treated at Episcopal Hospital by Episcopal's residents and by the nursing staff.

On December 15, 1993, Ms. Milton presented herself to Dr. Allen who had been providing her with prenatal care. Ms. Milton's blood pressure was noted to be 140/110 sitting and 150/90 in the left lateral recumbent position. A urine dipstick test indicated +2 proteinuria.[1] Dr. Allen ordered a non-stress test, biophysical profile, and another blood pressure check at Episcopal Hospital. Ms.

---

1. Pregnancy-induced hypertension is characterized by, among others, hypertension, edema and proteinuria, and usually manifests after the 32nd week of pregnancy. See Harrison's Principles of Internal Medicine, Ninth Edition (1980) at p. 1342. Decedent, Claudette Milton, manifested all three major symptoms of PIH prior to, or at this December 15, 1993 presentation to Dr. Allen, and later to Episcopal personnel on the same day.

Milton presented herself to Episcopal Hospital on the same day, December 15, 1993. Upon her presentation at Episcopal, resident physician Dr. DeSilva performed the NST test, checked her BP, and noted both as being within normal limits. However, Ms. Milton complained of lightheartedness, abdominal swelling and heartburn, as well as leg pain. Dr. DeSilva ordered a PIH workup, and consistent with Ms. Milton's symptoms, diagnosed her with PIH. Notwithstanding the PIH diagnosis, Dr. DeSilva sent her home with only a prescription for iron supplements. No one at Episcopal advised Ms. Milton of the risks of PIH, not even in light of her documented family history of PIH.

On December 22, 1993, Ms. Milton presented herself to Dr. Allen with complaints of irregular contractions. Her cervix was 1cm dilated and 50 percent effaced. Dr. Allen ordered a non-stress test and urine dipstick at Episcopal. The NST and urine dipstick were performed at Episcopal on December 22, 1993 by Episcopal's nurses and physicians. The dipstick was again +2, while the blood pressure recorded 170/100. Laboratory tests were neither ordered nor were Ms. Milton's reflexes checked. Notwithstanding the clearly elevated blood pressure and dipstick results, Episcopal's staff neither admitted Ms. Milton, nor even questioned Dr. Allen's instructions to Ms. Milton to go home and return to Episcopal Hospital on December 23, 1993 for labor induction. Further, Episcopal staff did not apprise Ms. Milton of any dangers she may have been facing due to preeclampsia, in light of the PIH diagnosis on December 15, 1993, and her elevated blood pressures both on December 15, 1993 and on the same day, December 22, 1993.

On December 23, 1993, Ms. Milton presented herself to Episcopal Hospital for induction of labor, and, according to the testimony of the nurse on duty and the nursing note, was admitted at 7:30 a.m. Upon admission, Ms. Milton was kept in a waiting room known as PM6 from 7:30 a.m. until 9 p.m., instead of being admitted immediately to the labor and delivery room as provided for by Episcopal's own protocol for patients with PIH. An admitting note by Episcopal resident Dr. Ellen G. Wood reiterated the already known fact that Ms. Milton had a family history of preeclampsia, and noted that she was complaining of a headache. However, no labs were ordered on December 23, 1993.

At 9 a.m. on December 23, 1993, according to the first nursing note, Ms. Milton's BP was 181/100, clearly indicating elevation, and she was complaining of headaches. At this time, she was transferred to labor and delivery for induction. Despite resident physicians and nursing assessments showing consistently elevated BPs, she was not started on blood pressure-lowering drugs, essential for her condition, until 8:40 a.m. on December 24, 1993.

At or about 11:30 a.m. on December 24, 1993, Ms. Milton was rushed to the operating room where an emergency C-section was performed under the worst possible condition, according to plaintiffs' expert, Dr. Paul Gatewood, and her baby delivered. Despite her obese condition and her severely preeclamptic condition, Episcopal's obstetrical physicians and nurses did not order deep vein thrombosis prophylaxis, such as the initiation of heparin therapy or even putting antithrombin hoses on Ms. Milton, resulting in the formation of blood clots

in her lungs and onset of pulmonary edema, a complication of severe preeclampsia accompanied by the filling of the lungs with fluid.

Ms. Milton briefly regained consciousness following her C-section, but soon thereafter her condition deteriorated, resulting in her being placed on a ventilator to assist with her breathing, and transfer to the intensive care unit. While in the ICU, Ms. Milton initially improved and then deteriorated. Her consulting and attending physicians in the ICU failed to diagnose her multiple pulmonary emboli, and again failed to timely order deep vein thrombosis prophylaxis, such as heparin therapy and putting her in antihrombotic hoses. Her endotracheal tube was consistently malpositioned. She developed adult respiratory distress syndrome, and died on January 4, 1994 at the young age of 26.

## I. A FINDING OF CORPORATE NEGLIGENCE BY THE JURY IS JUSTIFIED BY THE EVIDENCE AND LAW OF THIS CASE

Defendant, Episcopal, asserts that it is entitled to judgment n.o.v. on the jury's finding of corporate negligence on the following grounds, *i.e.,* (1) that plaintiffs allegedly failed to establish corporate negligence, (2) that plaintiffs' expert, Dr. Paul Gatewood, was improperly permitted to testify about Episcopal's corporate negligence, and (3) that the evidence presented failed to establish a causal connection between Episcopal's conduct and the injury and death of decedent.

In the seminal case of *Thompson v. Nason Hospital,* 527 Pa. 330, 591 A.2d 703 (1991), the Pennsylvania Supreme Court first recognized the doctrine of corpo-

rate negligence and held that a hospital may be subjected to direct liability if it fails to uphold any one of the following four duties: "(1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment . . .; (2) a duty to select and retain only competent physicians . . .; (3) a duty to oversee all persons who practice medicine within its walls as to patient care . . .; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients . . . ." *Thompson,* 527 Pa. at 339-40, 591 A.2d at 707.

Further, *Thompson* emphasized that corporate negligence is a doctrine under which the hospital is liable if it fails to uphold the proper standard of care owed the patient, which is to ensure the patient's safety and well-being while at the hospital. This theory of liability, according to *Thompson,* creates a nondelegable duty which the hospital owes directly to the patient.

In the instant case, duty number 3, *supra,* is the duty the plaintiffs assert has been breached in this case.

Regarding the type of evidence required to impose liability on a hospital based on a corporate negligence claim, *Thompson* emphasized that, "It is well established that a hospital staff member or employee *has a duty to recognize and report abnormalities in the treatment and condition of its patients."* 527 Pa. at 342, 591 A.2d at 709. (emphasis added) Having so emphasized, *Thompson* then expressly held, *"When there is a failure to report changes in a patient's condition and/or to question a physician's order which is not in accord with standard medical practice and the patient is injured as a result, the hospital will be held liable for such negligence."* 527 Pa. at 342-43, 591 A.2d at 709. (emphasis added)

The defendant relies on the Superior Court's decision in *Edwards v. Brandywine Hospital,* 438 Pa. Super. 673, 652 A.2d 1382 (1995), which appears to require a demonstration of systemic negligence by a hospital defendant in violation of duty number 3 as set forth in *Thompson* in order to constitute corporate negligence. However, two years after *Edwards,* the Supreme Court revisited the issue of the sufficiency of corporate negligence evidence in *Welsh v. Bulger,* 548 Pa. 504, 698 A.2d 581 (1997). The *Welsh* court addressed, and then set forth the type of evidence required to prove a case of direct liability against a defendant hospital under the corporate negligence doctrine. The facts briefly in *Welsh* indicate the following: plaintiff, Bobbi Jo Welsh, received prenatal care from defendant, Donald W. Bulger M.D., of Claysburg Medical Associates. Close to her term pregnancy, Mrs. Welsh started experiencing contractions. In response, Dr. Bulger directed her to defendant, Nason Hospital, where he had obstetrical, but not surgical privileges. At Nason, Dr. Bulger examined plaintiff, performed an amniotomy, and, following the production of meconium, placed her on a fetal monitoring device. The fetal monitor showed consecutive nonassuring variable deceleration patterns, indicative of possible interference with umbilical blood flow to the fetus. Despite the nonassuring decelerations, both Dr. Bulger and the hospital's staff, in particular the nurses, failed to call surgical delivery as the standard of care required. Following Dr. Bulger's vaginal delivery of the baby with forceps, the baby suffered severe complications and died 11 months later. Plaintiff brought suit, charging Nason Hospital, inter alia, with corporate negligence for its own independent acts of negligence. Plain-

tiff alleged that Nason was corporately liable for, among others, the failure of its staff to notify it, Nason Hospital, that the decedent minor needed a surgical delivery. In support of its corporate negligence count, plaintiff alleged that Nason Hospital was directly liable for the plaintiff's harm *"because its staff failed to notify the hospital that Welsh's child needed a surgical delivery."* *Welsh,* 548 Pa. at 509, 698 A.2d at 583. (emphasis added)

In *Welsh,* one of the plaintiff's experts opined in his report that had the nurses and other hospital staff acted appropriately in light of the infant's condition, the infant would have been born healthy and would have lived a normal life. Regarding the corporate negligence action, plaintiff's expert opined that Nason Hospital was corporately negligent because its "nurses must have known what was going on," *Welsh,* 548 Pa. at 511, 698 A.2d at 584, but failed to notify the hospital and/or undertake measures to assure the proper treatment of Mrs. Welsh. Plaintiff's expert further opined that, "If Dr. Bulger had arranged for an appropriate cesarean section *or the hospital had arranged for an appropriate cesarean section with the nurses' input on this, there is every reason to believe that Kyle Allan Welsh . . . would be an absolutely normal child today."* *Id.* (emphasis added)

Apparently, Nason did not challenge the contention that its nurses were negligent, but rather filed a motion for summary judgment arguing that there was no issue to be tried with respect to its direct liability "because Welsh's expert reports failed to support her claims against the hospital." *Id.* The trial court granted the motion and dismissed the corporate negligence count against the hospital. The Superior Court affirmed.

The Pennsylvania Supreme Court "granted allocatur to address the issue of what type of evidence is necessary to establish a prima facie claim of corporate liability for negligence against a hospital pursuant to our decision in *Thompson v. Nason,* 527 Pa. 330, 591 A.2d 703 (1991)." *Welsh,* 548 Pa. at 511-12, 698 A.2d at 584. (footnote omitted) The *Welsh* court quoted its position in the *Thompson* case, *supra,* as follows:

"As we explained in *Thompson,* [i]t is well established that a hospital staff member or employee has a duty to recognize and report abnormalities in the treatment and condition of its patients. If the attending physician fails to act after being informed of such abnormalities, it is then incumbent upon the hospital staff member or employee to so advise the hospital authorities so that appropriate action might be taken. When there is a failure to report changes in a patient's condition and/or to question a physician's order which is not in accord with standard medical practice and the patient is injured as a result, the hospital will be liable for such negligence. *Thompson,* 527 Pa. at 342-43, 591 A.2d at 709 (citations omitted)." *Welsh,* 548 Pa. at 516 n.13, 698 A.2d at 586 n.13.

The *Welsh* court recognized and agreed with the plaintiff's expert in that case who claimed that the hospital was corporately negligent for the failure to monitor and report the child's condition, "which is a violation of the duty to oversee all persons who practice medicine within its walls as to patient care, the third duty under *Thompson.*" *Welsh,* 548 Pa. at 516, 698 A.2d at 586. The *Welsh* court held that the plaintiff's expert report was "sufficient to support a prima facie claim of corporate negligence for Nason Hospital's failure to oversee all persons who practice medicine within its walls as to pa-

tient care. *Thompson; Walls." Welsh,* 548 Pa. at 516, 698 A.2d at 586.

The *Welsh* court did not require a showing of "systemic" negligence by the hospital defendant to establish corporate liability even though such a showing is also satisfied here.

Plaintiffs' experts, Gatewood and Miller, provided adequate testimony to establish corporate liability to the jury.

This court adopts the extensive showing of these excerpts of its experts in this case as set forth in the plaintiffs' brief as follows:

Specifically, Dr. Gatewood was asked the following questions and testified as follows:

"Plaintiffs' counsel: Q. Have you formed an opinion as to whether or not Episcopal Hospital conformed to the standard of care of a hospital acting in the same or similar circumstances in the manner in which it provided care to Claudette Milton on December 15, 1993?" (T.R., Paul D. Gatewood M.D., 7/14/99, pp. 75, 1. 21- 76, 1. 2.)

"Dr. Gatewood: A. Again, as we've discussed earlier in this deposition, the nurses are trained in those complications of pregnancy. And PIH is an extremely common complication of pregnancy. To allow a patient to be discharged, recognizing nurses cannot order patients to be admitted or discharged, but allowing a patient to be discharged, knowing fully well that she has been incompletely evaluated, falls below accepted standards of nursing care as from an obstetrical point of view. If the resident insisted on discharging this patient and the nurse, knowing fully well that the evaluation requires the laboratory work to be on the chart and evaluated, requires

that the patient be evaluated for several hours for evaluation of her blood pressure, and the resident and/or the attending insists on discharging, then *the nurse has the obligation to go to her supervisor and inform the supervisor of this problem that has developed.* And the supervisor then takes it from there to resolve the conflict between appropriate nursing care and discharging of this patient. *It's called chain of command.* And it has been used. It should be used. *And the chain of command can go all the way to the chairman of the department or the director of nursing.* So the nurses were wrong also and fell below accepted standards of care from an obstetrical standpoint, from an obstetrician standpoint, in discharging this patient, who was at term and showing the symptomatology, the classic symptomatology of toxemia or preeclampsia, and allowing this patient to go home." (T.R., Paul D. Gatewood M.D., 7/14/99, pp. 76, l. 18-78, l. 8.) (emphasis added)

Regarding his reason for describing the nurses' negligence in opining that Episcopal Hospital was corporately negligent, Dr. Gatewood testified as follows:

"Plaintiffs' counsel: Q. Now, doctor, this may be obvious to you, but I'd like to ask it anyhow. I asked you in terms of whether or not Episcopal Hospital conformed to the standard of care, and you referred to the conduct of the nurses in connection with answering the question.

"Dr. Gatewood: A. Well, the hospital is a brick-and-mortar structure. Therefore, the hospital is not, as a structure, going to do anything. However, the hospital provides the health providers. The nurses and the residents are employees of the hospital. And the hospital divisions

develop guidelines for the management of complications associated with whatever the particular department of the hospital it happens to be. Here we're discussing the division of Ob/Gyn, specifically the division of obstetrics. And so *the nurse is under the auspices of the responsibility of the division of obstetrics in the department of Ob/Gyn in that hospital, and is an employee not of the department but of the hospital.*" (T.R., Paul D. Gatewood M.D., 7/14/99, pp. 78, 1. 9-79, 1. 9.) (emphasis added)

Having unequivocally testified that the nurses who were practicing medicine within Episcopal Hospital's walls deviated on December 15, 1993 from the standard of care owed Ms. Milton, which deviation Episcopal was obligated to prevent, Dr. Gatewood emphatically opined that this deviation substantially contributed to Ms. Milton's death. Dr. Gatewood testified:

"Plaintiffs' counsel: Q. And, doctor, do you have an opinion, to a reasonable medical certainty, as to whether or not the failure of Dr. Silva and the failure of the hospital and the nurses to conform to the required standard of care on December 15, 1993, contributed to the death of Claudette Milton?" (T.R., Paul D. Gatewood M.D., 7/14/99, p. 79, ll. 10-15.)

"Plaintiffs' counsel: Q. And can you tell us what that opinion is and what the basis of the opinion is?

"Dr. Gatewood: A. Yes, sir. This patient was term; she was sick; she had PIH, pregnancy-induced hypertension. She had the preeclamptic form. And she presented with elevated blood pressures, two-plus proteinuria and edema. That's the triad of preeclampsia. *This patient*

*needed to be delivered. By allowing the patient to go home and returning to the hospital eight or nine days later for an induction, at which time there was no notation at all about the pregnancy-induced hypertension, allowed the disease process to continue.* Preeclampsia is not you have it one day and you don't have it the next day. It is a progressive disorder. And by not placing the patient in the hospital, ordering—attempting an induction, which, in my opinion, would have failed anyway because of the size of the baby and the size of the mother, the patient would have had a cesarean section, there would have been good control, and in all probability, the blood pressure crises that occurred later on would not have happened. This was the first major—this was the first notation of increased blood pressure. And *had they, in all probability, acted at that time, this patient would have had a successful delivery and would be alive today. By allowing the patient to go home and delaying treatment, the disease progressed to the point that it became fulminant preeclampsia. While she was in labor, she went into the complications of pulmonary edema, required a section under the absolute worst of circumstances, blood pressure out of control, pulmonary edema.* And the rest is history with the complications incurred by this patient postoperatively." (T.R., Paul D. Gatewood M.D., 7/14/ 99, pp. 80, l. 8-82, l. 2.) (emphasis added)

Appropriately, the defendant's obstetrical and gynecological expert, Frank J. Craparo M.D., agreed that a pregnancy accompanied by PIH is considered high risk. Dr. Craparo admitted that PIH poses a high risk to both the pregnant woman and the baby. Dr. Craparo offered the following testimony on cross-examination:

"Plaintiffs' counsel: Q. Would preeclampsia be considered a high-risk pregnancy?

"Dr. Craparo: A. Preeclampsia would be considered a high-risk pregnancy at the time it develops." (T.R., Frank J. Craparo M.D., 7/15/99, p. 24, ll. 19-22.)

"Plaintiffs' counsel: Q. But it is considered high risk and it's high risk to both the mother and the fetus?

"Dr. Craparo: A. Yes." (T.R., Frank J. Craparo M.D., 7/15/99, p. 25, ll. 2-4.)

Further, Dr. Craparo conceded that Ms. Milton was term on December 15, 1993 (T.R., 7/15/99, p. 38), and, more importantly, supported Dr. Gatewood's testimony that Episcopal, through its nurses and other staff, deviated from the standard of care on December 15, 1993 by discharging a patient who was term and had PIH, and not monitoring her BP until seven days later on December 22, 1993. Dr. Craparo admitted that the blood pressure of Ms. Milton should have been monitored within 24 to 48 hours once diagnosed with PIH on December 15, 1993 if Episcopal discharged her, which it did, on December 15, 1993. Most significantly, Dr. Craparo conceded that the definitive cure for PIH was delivery of the baby. Dr. Craparo testified as follows:

"Plaintiffs' counsel: Q. So, it's December 15 and we know we have a patient whose mother died of toxemia whose [sic] had a normal blood pressure through her pregnancy until today and we also know that she is passed [sic] her expected date of delivery, correct?

"Dr. Craparo: A. Okay.

"Plaintiffs' counsel: Q. *We also know, do we not, doctor, that if this is a pregnancy-induced hypertension that*

*the definitive cure for this illness, which is caused by the placenta, is delivery of the baby, correct?*

"Dr. Craparo: A. *That's correct.*" (T.R., Frank J. Craparo M.D., 7/15/99, pp. 77, l. 23-78, l. 9.) (emphasis added)

"Plaintiffs' counsel: Q. Well, let's start with your opinion that it was okay, it was within the standard of care to send her home?

"Dr. Craparo: A. Okay.

"Plaintiffs' counsel: Q. *If you are going to send her home, how frequently in accordance with reasonable care, would you monitor or measure her blood pressure?*

"Dr. Craparo: A. *Within 24 to 48 hours.*" (T.R., Frank J. Craparo M.D., 7/15/99, p. 79, ll. 14-22.) (emphasis added)

Regarding Episcopal's failure to uphold the standard of care owed to Ms. Milton on December 22, 1993 and December 23, 1993, and past her C-section on December 24, 1993, and the causal connections to her death, Dr. Gatewood, first, and then Dr. Miller, testified as follows:

"Plaintiffs' counsel: Q. Do you have an opinion, to a reasonable medical certainty, as to whether or not Dr. Allen and *Episcopal Hospital* conformed to the standard of care in the care they rendered on December 22, 1993?

"Dr. Gatewood: A. Sure." (T.R., Paul D. Gatewood M.D., p. 96, ll. 14-19.)

"Plaintiffs' counsel: Q. Would you tell the court and the jury what your opinion is?

"Dr. Gatewood: A. At the time that she was admitted on December 22, 1993, she was again with fulminate toxemia. *She needed to be admitted, stabilized, immediately induced or a section, if induction was not possible, to get the baby out and to stop the processes of preeclampsia. And that was not done.*

"Plaintiffs' counsel: Q. And do you have an opinion as to whether or not the failure to conform to the standard of care on December 22 contributed to her death?

"Dr. Gatewood: A. Yes, sir.

"Plaintiffs' counsel: Q. And what's that opinion and the basis of it?

"Dr. Gatewood: A. Again, even though we are now beyond the point where she should have already been delivered, if she had been admitted on the 15th, but toxemia is a progressive problem. Again, *had they started the induction at that time and had they seen that there was a failure in progress, in all probability, the fulminate aspect of the toxemia would not have occurred so rapidly. And in addition to that, with the morning admission to the hospital, if indeed the blood pressures did start to increase, it would have been immediate for a cesarean section delivery. So it was another 24-hour delay in the patient being treated for a progressive problem, which is toxemia.*

"Plaintiffs' counsel: Q. Now, you've used the term 'fulminate' and the term 'toxemia.' Would you explain what those terms mean?

"Dr. Gatewood: A. Well, the toxemia is the preeclampsia. I use preeclampsia/toxemia interchangeably. I'll try to remember to keep saying preeclampsia. But because I've been doing this for so many years, and that's the

term we used when we started. But the thing is, *the pre-eclampsia at that point in time was sufficient to immediately require—to immediately require steps made for delivery.* 'Fulminate' just simply means that the disease process, the hypertension, the high blood pressures, and the decrease in kidney function, as expressed by the increased amount of protein, the problems associated with the fetal heart, because of the decreased blood supply to the placenta, because of the increase in blood pressures. When you reach the point that the blood pressures have become dangerously high, with the diastolics over 100, remaining over 100, the systolics at 200 or greater, the chances of a stroke, the chances of a seizure are markedly increased. And that's what you mean by 'fulminate.' 'Fulminate,' meaning it's now getting completely out of hand. And by the time they finally delivered this patient, it was not only fulminate, it was life-threatening, because the patient was so sick. She now had her lungs filled with fluid, called pulmonary edema; she's having a major operation in a patient in the worst possible circumstances, with blood pressures out of control, pulmonary edema, fluid in the lungs, a baby that's in trouble. *This is the absolute worst case scenario one could put yourself into. And it did not have to happen.*" (T.R., Paul D. Gatewood M.D., 7/14/99, pp. 98, l. 3-100, l. 24.) (emphasis added)

"Plaintiffs' counsel: Q. Would you describe for the court and the jury her clinical condition when she presented on December 23 for admission, and what her progress was. *And tell us your opinion as to whether or not the hospital conformed to the standard of care from the time of her admission on December 23 until the time of delivery on December 24, and whether or not Dr. Allen*

*conformed to the standard of care during that same period."* (T.R., Paul D. Gatewood M.D., 7/14/99, p. 101, ll. 11-20.) (emphasis added)

"Dr. Gatewood: A. Okay. When she was admitted to the hospital at 7:30 a.m. on December 23, the admission notes that it was an induction for post dates. It's the responsibility of Dr. Wood, the resident who did the initial history and physical, *and the care-giving nurses* to have the patient's records present at the time of admission. And particularly, if they had had the patient's records, and with the clinic being right adjacent to the hospital where she was being seen, the standard is to have those records available immediately, particularly in a patient with a, quote, scheduled induction. They would have seen, obviously, that this patient had markedly elevated blood pressures in the month of December. In addition to that, *the nurses* and Dr. Wood would have seen very clearly that the patient had been evaluated on the 15th of December for pregnancy-induced hypertension. And she did have the edema and was sent in because of proteinuria and the elevated blood pressures. *All of that information was readily available and mandatory to be reviewed in a patient who presents at 350 pounds at 42 weeks for an induction. None of that was done. And that is a deviation, number one, by anyone and everyone that had anything to do with that patient from the time of 7:30 on."* (T.R., Paul D. Gatewood M.D., 7/14/99, pp. 103, l. 11-104, l. 16.)

"This patient had a blood pressure on admission of 148 over 82. And even if they only had the records up through the 36th week, which they should have had all of them, but even if they only had the ones up to 36 weeks

which were already sent to the hospital, and, according to the nurses' depositions, would have been available, they would have seen that this is an elevated blood pressure from what the patient normally had. They would have seen that the patient has—is edematous. This patient also, in the triage note, was complaining of intermittent headaches. The admitting report showed edema everywhere but in the periorbital or around the eyes. So here is a patient that had—and they did have the information. There was a family history of preeclampsia; presents with generalized edema; her blood pressure was 148 over 82; she's 42 weeks and being admitted for induction. *They had the ability and the requirement to look at the records. They did not do that. Not only did they not do that, they didn't even do a urine dip for this patient with this pressure, a headache and generalized edema. This is all documented.* Now, first of all that's the first deviation." (T.R., Paul D. Gatewood M.D., 7/14/99, pp. 104, l. 22-105, l. 25.) (emphasis added)

Episcopal's protocol required patients with PIH to be admitted immediately to the labor and delivery suite.[2] On December 23, 1993, Ms. Milton was admitted with a

2. See the testimony of Episcopal's own nurse, Kathleen Kelly R.N.:

"Any patient that is admitted with PIH for induction, if they are going to start induction right away, we would put them back in the labor room, start an I.V., get the medicine, whatever the doctor prefers to use for the induction, ready. Evaluate their vital signs every hour. Check their reflexes. When they void, check the protein in the urine." (T.R., Kathleen Kelly R.N., 7/21/99, p. 40.)

It is indisputable that Ms. Milton was admitted to Episcopal on December 23, 1993 with a PIH diagnosis. It is also indisputable that contrary to being put in the labor room, and monitored every hour, she was kept in a waiting area for almost 14 hours, and her vital statistics were only checked once.

diagnosis of PIH by one of Episcopal's own physicians. Yet, despite this PIH diagnosis which the hospital was aware or should have been aware of, Ms. Milton was admitted to a waiting area known as PM6, and not to the labor and delivery suite, and was made to wait in this waiting area for almost 14 hours, from 7:30 a.m. to 9 p.m., without necessary and timely monitoring for her condition.

Testifying about the failure by Episcopal to enforce its own protocol in the context of breach and causation, Dr. Gatewood opined:

"If you look at the guidelines for the use of PM6, a patient who is unstable—and they used the example: PIH is not to be admitted to that unit. She was admitted to that unit." (T.R., Paul D. Gatewood M.D., p. 106, ll. 4-8.)

"She was admitted to this unit against hospital protocol. She was improperly evaluated and then totally ignored for 14 and a half hours—for 14 hours. And the reason I say that is there was not a single blood pressure taken on this patient. There was not a single evaluation done of this patient until 9 in the evening. And at that point in time, when a blood pressure was taken, it was 181 over 100." (T.R., Paul D. Gatewood M.D., 7/14/99, p. 106, ll. 13-21.)

Dr. Gatewood continued:

"Plaintiffs' counsel: Q. Now, can you tell us what the deviation from the standard of care was during that period of time by the hospital acting through its residents and nurses?

"Dr. Gatewood: A. Well, during that period of time, as I kind of summarized, *first of all is the admission of*

*the patient to PM6, because it's in direct violation of the protocol.* The patient has been diagnosed with pregnancy-induced hypertension. *The failure of the residents and/or nurses to assure adequate basic every three- to four-hour vital signs on this patient while she is in the PM6 unit, none of those were done. The failure to contact the physician for the expediency of getting this patient induction started*—the patient was obviously stabilized. She needed to be induced immediately. The physician needed to do whatever is necessary, since they are in violation of the policies, to get that patient to labor and delivery and get the induction started to see if it could be successful, recognizing in all probability it's not going to work. But at least get the patient over to labor and delivery for continuous monitoring of the baby, as well as the monitoring of the patient's vital signs, which includes urine dips for protein every hour. And this was not done. *Appropriate laboratory studies done initially and repeated every six hours, this wasn't done.* Throughout the night there was no laboratory work ordered on this patient. It was not ordered, actually, until about 6:30 in the morning when she was a very sick patient. *So the failure to adequately monitor the patient, the failure to have the—to require the physician to come in to evaluate and do whatever is necessary to effect delivery, when the blood pressure started getting out of hand at 3 to 4 in the morning, and also as borne out by the records, when this patient had the markedly elevated blood pressures, the failure to have appropriate drug antihypertensive drugs on the unit.* The order was given, according to the resident's notes, by the doctor to give Labetalol for the hypertension. Now—and the order was given to get

Labetalol stat or immediately on the unit. And *it took about an hour and a half for them to even get the drug. This patient could have had a stroke very easily during that period of time when they didn't even have the drug available on the labor and delivery suite, which is totally inexcusable.* Then with the continuation of the liability, the marked fluctuation of her blood pressure in spite of the administration of antihypertensive agents, resulting in the requirement now for a stat cesarean section for fetal stress in a patient who is out of control, as far as her blood pressures, and unable to be controlled. And then it took an hour from the time they called for the C-section to even begin the C-section in a teaching hospital during the day, which is totally inexcusable. *So the whole scenario of the lack of management, lack of documentation of the care of this patient falls below acceptable standards of care. And as a direct result, this patient ended up having that C-section under the worst of conditions. And those actions, in my opinion, directly contributed to the final outcome of this case.*" (T.R., Paul D. Gatewood M.D., 7/14/99, pp. 110, line 19-113, l. 21.) (emphasis added)

Regarding the post-operative care deviations from the standard of care and the causal connections to the death of Ms. Milton, both Drs. Gatewood and Miller were precise and emphatic in their testimonies. Dr. Gatewood testified:

"Plaintiffs' counsel: Q. Do you have an opinion—I believe you've stated an opinion, but I'm going to ask it in a different form. Do you have an opinion, to a reasonable medical certainty, as to whether or not the deviations from the standard of care of the hospital, acting through its nurses

and residents that you've described, between her admission on December 23 and the cesarean section on December 24, contributed to her death?

"Dr. Gatewood: A. Yes, I do.

"Plaintiffs' counsel: Q. And what is that opinion?

"Dr. Gatewood: A. My opinion is these actions and the cesarean section, and the obstetrical care post-cesarean section and immediately post-cesarean section by the nurses and the residents and doctor—the attending physician, directly contributed to the final demise of this patient, specifically in that the patient was morbidly obese, was very sick, was obviously going to be on ventilator support. Now, I have no comment in reference to the management of the patient by the cardiologist, pulmonologist and other specialists involved in the care of this patient. *My comments are and the deviations are that this patient—it was mandatory that this patient, who was going to be in bed on respirator therapy and anticipated for a prolonged period of time, have appropriate deep venous vein—deep venous thrombosis prophylaxis started immediately. And by that I mean the antithrombotic hose and subcutaneous heparin.*" (T.R., Paul D. Gatewood M.D., 7/14/99, pp. 114, l. 19-116, l. 5.)

"A markedly obese patient is a much greater risk, in that they're not going to be able to get out of bed is a much greater risk for the development of deep venous thrombosis. And *it was the responsibility of the obstetrician and the obstetrical residents and the nurses, knowing fully well that this is a major risk factor of a cesarean section in an acutely ill patient, to provide the minimum prophylaxis to prevent deep venous thrombosis. And that is putting on the antithrombin hose and the doctors*

*to initiate heparin therapy. And this was not done."* (T.R., Paul D. Gatewood M.D., 7/14/99, p. 116, ll. 7-20.) (emphasis added)

Dr. Gatewood opined that had heparin therapy and antithrombin hose been initiated timely by the nurses, and by Episcopal, acting through its physicians and nurses, Ms. Milton would not have suffered the pulmonary embolism which killed her. Dr. Gatewood testified expressly, among others, "If you take a morbidly obese patient now and put her in the bed situation after pelvic surgery, without antithrombin therapy, and you're a setup, and as happened in this case—for deep venous thrombosis and a pulmonary embolus." (T.R., Paul D. Gatewood M.D., 7/14/99, p. 122.)

In addition to Dr. Gatewood, plaintiffs' pulmonary expert, Gary H. Miller M.D., opined that had Episcopal, acting through its agents, the physicians and nurses, initiated heparin therapy and other anti-clot measures on time, the chances of the pulmonary embolism happening would have been significantly reduced. Dr. Miller testified as follows:

"Plaintiffs' counsel: Q. And, doctor, do you have an opinion as to whether or not the hypertension that Claudette Milton suffered was in any way casually related to pulmonary edema discovered during the C-section?

"Dr. Miller: A. *I think the pulmonary edema was a complication for delivery of both her preeclamptic condition and the delivery,* and was fairly well-established at the time of her distress was one of the reasons for a cesarean section." (T.R., Gary Howard Miller M.D., 7/19/99, p. 13, ll. 9-17.) (emphasis added)

Accordingly, the corporate negligence finding was proper under the law and evidence.

## II. DR. GATEWOOD WAS PROPERLY PERMITTED TO TESTIFY ON THE ISSUE OF CORPORATE NEGLIGENCE

Episcopal asserts that this honorable court improperly permitted plaintiffs' expert, Dr. Gatewood, to testify on Episcopal's corporate negligence. In support of this contention, Episcopal asserts that "Dr. Gatewood by his own admission was not qualified to testify as a corporate liability expert," because "he has no type of special degree or special training in hospital administration and has never published on hospital administration issues." See Episcopal's brief at p. 11. Further, Episcopal cites a recent trial court opinion by Judge Bernstein, and speciously contends that it supports its argument that Dr. Gatewood was unqualified to testify on Episcopal's corporate negligence. Episcopal's arguments clash directly with the well-established standard under Pennsylvania regarding the admissibility of expert testimony.

First, concerning qualifications, it is well-settled under Pennsylvania law that a witness may testify as an expert provided he has "any reasonable pretension to specialized knowledge on the subject under investigation . . . ." *McDaniel v. Merck, Sharp & Dohme,* 367 Pa. Super. 600, 608, 533 A.2d 436, 440 (1987). Accord *Poleri v. Salkind,* 453 Pa. Super. 159, 683 A.2d 649 (1996); Pa.R.E. 702.

An examination of Dr. Gatewood's curriculum vitae, and his own voir dire testimony on examination, shows that he has been board-certified in obstetrics and gynecol-

ogy, the precise medical field involved in this lawsuit, since 1976. The same CV shows that he is an attending obstetrician/gynecologist in three major hospitals. Additionally, the CV indicates that he holds an academic appointment as a clinical assistant professor of medicine at Northeastern Ohio College of Medicine. By virtue of his position as an attending obstetrician/gynecologist in three major hospitals, Dr. Gatewood interacts with and supervises the actions of resident physicians and nurses who assist him in his capacity as an attending. Over the years, through his education and training, he has acquired specialized knowledge of the standard of care expected of resident physicians and nurses, and, more importantly, of what the standard of care requires of hospitals, especially teaching hospitals, regarding the treatment of high-risk patients.

Further, through his training, education, skill, and qualifications, he has treated and encountered patients with PIH, the precise disease process which tragically led to the death of Ms. Milton. Thus, it is clear that under *McDaniel, Poleri,* and Pa.R.E. 702, he was qualified, and was, thus, properly permitted to render opinions on the issues of corporate liability.

Defendant's reliance on *Lavish v. Archbold Ladder Co.,* 39 D.&C.4th 455 (Phila. C.C.P. 1999); 1999 Pa. Super. Lexis 3921 (Oct. 14, 1999), for the dubious proposition that Dr. Gatewood was improperly allowed to render expert opinions on the issue of corporate negligence, is clearly misplaced. The facts in *Lavish* which compelled Judge Bernstein to find that the plaintiff's expert in that case was unqualified to render expert opinion are clearly distinguishable from the facts in the instant case. *Lavish* involved the breakage of a stepladder while plaintiff was

standing on the third step of the ladder. Pretrial, plaintiff's expert, a Dr. Snyder, a mechanical engineer with experience in product design and analysis, who had neither worked for any company manufacturing wooden ladders nor acquired familiarity with wood products, opined that the wood involved was a Douglas fir. However, upon reviewing the defense expert's opinion, Dr. Snyder conceded that the wood was southern yellow pine as the defense expert indicated. Also at pretrial, Dr. Snyder opined that the allegedly defective ladder was made of low density wood, but again, after reviewing the defense expert's report, changed his opinion and adopted what appeared to be the defense expert's position that the ladder was made of high density wood. Significantly, Dr. Snyder admitted that "he is not an expert on wood products," and that he "lacks expertise in ladder design or manufacturing." *Lavish v. Archbold Ladder Co.,* 39 D.&C.4th 455, 463; 1 Phila. 2d 208, 217 (1999).

Following a jury verdict in favor of plaintiff, defendant sought post-trial relief, alleging that Dr. Snyder was not qualified to render an opinion on wood since he admitted that he had no expertise, either by formal training or by experience in wood and wood products. In reversing himself and granting a new trial, Judge Bernstein pointed out the various admissions by Dr. Snyder set forth above, and noted that Dr. Snyder, by his admission, lacked qualifications by either experience or formal training in the crucial area at issue, *i.e.,* wood and wood products.

Notwithstanding his ruling, Judge Bernstein reaffirmed the well-established rule under Pennsylvania law that "[a] witness may qualify as an expert if his experience or education logically or fundamentally embraces the sub-

ject at issue . . . ." 39 D.&C.4th at 467; 1 Phila. 2d at 221, quoting *Montgomery v. South Philadelphia Medical Group*, 441 Pa. Super. 146, 151-52, 656 A.2d 1385, 1388 (1995) (allowing a physician to testify regarding a breach of duty by a physician's assistant, because "[k]nowledge as to the treatment and care of patients which may be possessed by a physician's assistant is also knowledge generally possessed by a medical doctor."). *Id.* at 467-68; 1 Phila. 2d at 221. (footnote omitted)

The facts in the instant matter are clearly distinguishable from the facts in *Lavish*. Dr. Gatewood expressly testified, unimpeached, that he was board-certified in the field of obstetrics and gynecology, and currently heads the Ob/Gyn department at Allen Memorial Hospital in Ohio. (T.R., Paul D. Gatewood M.D., 7/14/99, p. 38.) In addition, he testified that he was familiar with the standard of care required in the treatment of patients presenting with PIH (the precise issue in this case) in 1993, having treated hundreds of such patients in a hospital environment, and having delivered over 4,000 babies. (T.R., Paul D. Gatewood M.D., 7/14/99, pp. 25-27.) Further, Dr. Gatewood, unlike the expert in *Lavish,* never wavered in his opinions nor changed his opinion upon reviewing the opinions of Episcopal's experts. On the contrary, Episcopal's expert, Dr. Craparo, agreed with him on the standard care for the treatment of PIH.

In addition, the standard of care which *Thompson, Welsh* and *Shannon* compelled Episcopal to uphold in the treatment of Ms. Milton in order to ensure her safety ˙ (proper treatment of PIH), which Episcopal failed to do, is the same standard of care to which Dr. Gatewood demonstrated knowledge of, based on education and train-

ing. Accordingly, this court properly allowed Dr. Gatewood to testify about Episcopal's negligence.

Dr. Gatewood had the credentials concerning corporate negligence.

## III. THE EVIDENCE JUSTIFIED A FINDING OF CAUSAL CONNECTION BETWEEN EPISCOPAL'S CORPORATE NEGLIGENCE AND MS. MILTON'S DEATH

Episcopal asserts: "Never in the course of his deposition, however, did Dr. Gatewood testify that any alleged deviation from the duty to go up the chain of command caused, contributed to, or in any way worsened Ms. Milton's injuries." (Episcopal's brief at 13.)

This statement is completely inaccurate. Dr. Gatewood testified that had the nurses gone up through the chain of command on December 15, 1993 when Dr. DeSilva discharged Ms. Milton, who was already term, and had been diagnosed with PIH, the nursing supervisor would have had the obligation of taking it all the way to the director of nursing or even the chairman of the Ob/Gyn department, and proper treatment (meaning delivery of the baby, or admission for close monitoring), in all likelihood, would have been effected. Dr. Gatewood was asked and testified as follows:

"Plaintiffs' counsel: Q. Have you formed an opinion as to whether or not Episcopal Hospital conformed to ·the standard of care of a hospital acting in the same or similar circumstances in the manner in which it provided care to Claudette Milton on December 15, 1993?" (T.R., Paul D. Gatewood M.D., 7/14/99, pp. 75, l. 21-76, l. 2.)

"Dr. Gatewood: A. Again, as we've discussed earlier in this deposition, the nurses are trained in those complications of pregnancy. And PIH is an extremely common complication of pregnancy. *To allow a patient to be discharged, recognizing nurses cannot order patients to be admitted or discharged, but allowing a patient to be discharged, knowing fully well that she has been incompletely evaluated, falls below accepted standards of nursing care as from an obstetrical point of view.* If the resident insisted on discharging this patient and the nurse, knowing fully well that the evaluation requires the laboratory work to be on the chart and evaluated, requires that the patient be evaluated for several hours for evaluation of her blood pressure, and the resident and/or the attending insists on discharging, then *the nurse has the obligation to go to her supervisor and inform the supervisor of this problem that has developed.* And the supervisor then takes it from there to resolve the conflict between appropriate nursing care and discharging of this patient. It's called chain of command. And it has been used. It should be used. And the chain of command can go all the way to the chairman of the department or the director of nursing. So the nurses were wrong also and fell below accepted standards of care from an obstetrical standpoint, from an obstetrician standpoint, in discharging this patient, who was at term and showing the symptomatology, the classic symptomatology of toxemia or preeclampsia, and allowing this patient to go home." (T.R., Paul D. Gatewood M.D., 7/14/99, pp. 76, l. 18-78, l. 8.) (emphasis added)

Regarding his reason for describing the nurses' negligence in opining that Episcopal Hospital was corporately negligent, Dr. Gatewood testified as follows:

"Plaintiffs' counsel: Q. Now, doctor, this may be obvious to you, but I'd like to ask it anyhow. I asked you in terms of whether or not Episcopal Hospital conformed to the standard of care, and you referred to the conduct of the nurses. Can you tell the jury how a hospital provides care and why you refer to the nurses in connection with answering that question.

"Dr. Gatewood: A. Well, the hospital is a brick-and-mortar structure. Therefore, the hospital is not, as a structure, going to do anything. However, the hospital provides the health providers. The nurses and the residents are employees of the hospital. And the hospital divisions develop guidelines for the management of complications associated with whatever the particular department of the hospital it happens to be. Here we're discussing the division of Ob/Gyn, specifically the division of obstetrics. And so *the nurse is under the auspices of the responsibility of the division of obstetrics in the department of Ob/Gyn in that hospital, and is an employee not of the department but of the hospital.*" (T.R., Paul D. Gatewood M.D., 7/14/99, pp. 78, l. 9-79, l. 9.) (emphasis added)

Having testified that the nurses breached the standard of care by not going through the chain of command to obtain proper treatment for Ms. Milton, Dr. Gatewood opined that such breach which allowed the discharge of Ms. Milton on December 15, 1993 substantially contributed to her harm. Dr. Gatewood testified:

"Plaintiffs' counsel: Q. And, doctor, do you have an opinion, to a reasonable medical certainty, as to whether or not the failure of Dr. DeSilva and the failure of the hospital and the nurses to conform to the required standard of care on December 15, 1993, contributed to the

death of Claudette Milton?" (T.R., Paul D. Gatewood M.D., 7/14/99, p. 79, ll. 10-15.)

"Dr. Gatewood: A. Yes, I do.

"Plaintiffs' counsel: Q. And can you tell us what that opinion is and what the basis of the opinion is?

"Dr. Gatewood: A. Yes, sir. This patient was term; she was sick; she had PIH, pregnancy-induced hypertension. She had the preeclamptic form. And she presented with elevated blood pressures, two-plus proteinuria and edema. That's the triad of preeclampsia. *This patient needed to be delivered. By allowing the patient to go home and returning to the hospital eight or nine days later for an induction, at which time there was no notation at all about the pregnancy-induced hypertension, allowed the disease process to continue.*

"Preeclampsia is not you have it one day and you don't have it the next day. It is a progressive disorder. And by not placing the patient in the hospital, ordering—attempting an induction, which, in my opinion, would have failed anyway because of the size of the baby and the size of the mother, the patient would have had a cesarean section, there would have been good control, and in all probability, the blood pressure crises that occurred later on would not have happened. This was the first major— this was the first notation of increased blood pressure. And *had they, in all probability, acted at that time, this patient would have had a successful delivery and would be alive today. By allowing the patient to go home and delaying treatment, the disease progressed to the point that it became fulminant preeclampsia. While she was in labor, she went into the complications of pulmonary edema, required a section under the absolute worst of circumstances, blood pressure out of control, pulmonary*

*edema.* And the rest is history with the complications incurred by this patient post-operatively." (T.R., Paul D. Gatewood M.D., 7/14/99, pp. 80, l. 7-82, l. 2.) (emphasis added)

It is thus clear that Dr. Gatewood tied the nurses and, correspondingly, the hospital's failure to conform to the standard of care on December 15, 1993 to the increased risk of harm to Ms. Milton, *i.e.,* delayed treatment allowed the PIH to become fulminant, and resulted in the complications post-delivery which caused the pulmonary emboli. The foregoing statement by itself is sufficient to satisfy the causation requirement in this case. For it is well-settled that causation is proven:

"Once a plaintiff has introduced evidence that a defendant's negligent act or omission increased the risk of harm to a person in plaintiff's position, and that the harm was in fact sustained, . . . ." *Hamil v. Bashline,* 481 Pa. 256, 269, 392 A.2d 1280, 1286 (1978).

See also, Restatement (Second) of Torts §323(a), which provides:

"One who undertakes, gratuitously or for consideration to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

"(a) his failure to exercise such care increases the risk of such harm,"

Further, in addition to showing causation on December 15, 1993, plaintiffs, through Drs. Gatewood and Miller, demonstrated Episcopal's breaches of duty on December 22, 1993, December 23, 1993, and post-delivery, and clearly proved that these breaches were the

proximate cause of Ms. Milton's untimely death. On the issue of causation on December 22, 1993, Dr. Gatewood testified:

"Plaintiffs' counsel: Q. Do you have an opinion, to a reasonable medical certainty, as to whether or not Dr. Allen and *Episcopal Hospital* conformed to the standard of care in the care they rendered on December 22, 1993?

"Dr. Gatewood: A. Sure.

"Plaintiffs' counsel: Q. Would you tell the court and the jury what your opinion is?

"Dr. Gatewood: A. At the time that she was admitted on December 22, 1993, she was again with fulminate toxemia. *She needed to be admitted, stabilized, immediately induced or a section, if induction was not possible, to get the baby out and to stop the processes of preeclampsia. And that was not done.*

"Plaintiffs' counsel: Q. And do you have an opinion as to whether or not the failure to conform to the standard of care on December 22 contributed to her death?

"Dr. Gatewood: A. Yes, sir.

"Plaintiffs' counsel: Q. And what's that opinion and the basis of it?

"Dr. Gatewood: A. Again, even though we are now beyond the point where she should have already been delivered, if she had been admitted on the 15th, but toxemia is a progressive problem. Again, *had they started the induction at that time and had they seen that there was a failure in progress, in all probability, the fulminate aspect of the toxemia would not have occurred so rapidly. And in addition to that, with the morning admission to the hospital, if indeed the blood pressures did start to increase, it would have been immediate for a cesarean section delivery. So it was another 24-hour*

*delay in the patient being treated for a progressive problem, which is the toxemia.*

Regarding Episcopal's breach of duty and causation on December 23, 1993, Dr. Gatewood opined:

"If you look at the guidelines for the use of PM6, a patient who is unstable—and they used the example: PIH is not to be admitted to that unit. She was admitted to that unit. She was admitted to this unit against hospital protocol. She was improperly evaluated and then totally ignored for 14 and a half hours—for 14 hours. And the reason I say that is there was not a single blood pressure taken on this patient. There was not a single evaluation done of this patient until 9 in the evening. And at that point in time, when a blood pressure was taken, it was 181 over 100." (T.R., Paul D. Gatewood M.D., 7/14/99, p. 106.)

Dr. Gatewood continued:

"Plaintiffs' counsel: Q. Now, can you tell us what the deviation from the standard of care was during that period of time by the hospital acting through its residents and nurses?

"Dr. Gatewood: A. Well, during that period of time, as I kind of summarized, *first of all is the admission of the patient to PM6, because it's in direct violation of the protocol.* The patient has been diagnosed with pregnancy-induced hypertension. *The failure of the residents and/ or nurses to assure adequate basic every three- to four-hour vital signs on this patient while she is in the PM6 unit, none of those were done. The failure to contact the physician for the expediency of getting this patient induction started*—the patient was obviously stabilized. She needed to be induced immediately. The physician needed to do whatever is necessary, since they are in

violation of the policies, to get that patient to labor and delivery and get the induction started to see if it could be successful, recognizing in all probability it's not going to work. But at least get the patient over to labor and delivery for continuous monitoring of the baby, as well as the monitoring of the patient's vital signs, which includes urine dips for protein every hour. And this was not done. *Appropriate laboratory studies done initially and repeated every six hours, this wasn't done.* Throughout the night there was no laboratory work ordered on this patient. It was not ordered, actually, until about 6:30 in the morning when she was a very sick patient. So *the failure to adequately monitor the patient, the failure to have the—to require the physician to come in to evaluate and do whatever is necessary to effect delivery, when the blood pressure started getting out of hand at 3 to 4 in the morning, and also as borne out by the records, when this patient had the markedly elevated blood pressures, the failure to have appropriate drug antihypertensive drugs on the unit.* The order was given, according to the resident's notes, by the doctor to give Labetalol for the hypertension. Now—and the order was given to get Labetalol stat or immediately on the unit. And *it took about an hour and a half for them to get even the drug. This patient could have had a stroke very easily during that period of time when they didn't even have the drug available on the labor and delivery suite, which is totally inexcusable.* Then with the continuation of the lability, the marked fluctuation of her blood pressure in spite of the administration of antihypertensive agents, resulting in the requirement now for a stat cesarean section for fetal stress in a patient who is out of control, as far as her blood pressures, and unable to be controlled.

And then it took an hour from the time they called for the C-section to even begin the C-section in a teaching hospital during the day, which is totally inexcusable. *So the whole scenario of the lack of management, lack of documentation of the care of this patient falls below acceptable standards of care. And as a direct result, this patient ended up having that C-section under the worst of conditions. And those actions, in my opinion, directly contributed to the final outcome of this case."* (T.R., Paul D. Gatewood M.D., 7/14/99, pp. 110, 1. 19-113, 1. 21.) (emphasis added)

Dr. Gatewood's and Dr. Miller's testimony on causation post-delivery were also emphatic and not subject to doubt. Dr. Gatewood testified:

"Plaintiffs' counsel: Q. Do you have an opinion—I believe you've stated an opinion, but I'm going to ask it in a different form. Do you have an opinion, to a reasonable medical certainty, as to whether or not the deviations from the standard of care of the hospital, acting through its nurses and residents that you've described, between her admission on December 23 and the cesarean section on December 24, contributed to her death?

"Dr. Gatewood: A. Yes, I do.

"Plaintiffs' counsel: Q. And what is that opinion?

"Dr. Gatewood: A. My opinion is these actions and the cesarean section, and the obstetrical care post-cesarean section and immediately post-cesarean section by the nurses and the residents and doctor—the attending physician, directly contributed to the final demise of this patient, specifically in that the patient was morbidly obese, was very sick, was obviously going to be on ventilator support. Now, I have no comment in reference to

the management of the patient by the cardiologist, pulmonologist and other specialists involved in the care of this patient. *My comments are and the deviations are that this patient—it was mandatory that this patient, who was going to be in bed on respirator therapy and anticipated for a prolonged period of time, have appropriate deep venous vein—deep venous thrombosis prophylaxis started immediately. And by that I mean the antithrombotic hose and subcutaneous heparin."* (T.R., Paul D. Gatewood M.D., 7/14/99, pp. 114, l. 19-116, l. 5.)

"A markedly obese patient is a much greater risk, in that they're not going to be able to get out of bed is a much greater risk for the development of deep venous thrombosis. And *it was the responsibility of the obstetrician and the obstetrical residents and the nurses, knowing fully well that this is a major risk factor of a cesarean section in an acutely ill patient, to provide the minimum prophylaxis to prevent deep venous thrombosis. And that is putting on the antithrombin hose and the doctors to initiate heparin therapy. And this was not done."* (T.R., Paul D. Gatewood M.D., 7/14/99, p. 116, ll. 7-20.) (emphasis added)

Dr. Gatewood opined that had heparin therapy and antithrombin hose been initiated timely by the nurses, and by Episcopal, acting through its physicians and nurses, Ms. Milton would not have suffered the pulmonary embolism which killed her. Dr. Gatewood testified expressly, among others, "If you take a morbidly obese patient now and put her in the bed situation after pelvic surgery, without antithrombin therapy, and you're a setup, and as happened in this case—for deep venous thrombosis and a

pulmonary embolus." (T.R., Paul D. Gatewood M.D., 7/14/99, p. 122.)

In addition, Dr. Miller opined that had Episcopal, acting through its agents, the physicians and nurses, initiated heparin therapy and other anti-clot measures on time, the chances of the pulmonary embolism happening would have been significantly reduced. Dr. Miller testified:

"Plaintiffs' counsel: Q. And, doctor, do you have an opinion as to whether or not the hypertension that Claudette Milton suffered was in any way casually related to pulmonary edema discovered during the C-section?

"Dr. Miller: A. *I think the pulmonary edema was a complication for delivery of both her preeclamptic condition and the delivery,* and was fairly well-established at the time of her distress was one of the reasons for the cesarean section." (T.R., Gary Howard Miller M.D., 7/19/99, p. 13, ll. 9-17.) (emphasis added)

From the foregoing excerpts of Drs. Gatewood's and Miller's testimonies, it is abundantly clear that plaintiffs introduced evidence that Episcopal breached the standard of care in the treatment of Ms. Milton, that the breach substantially increased the risk of harm to her, and that the harm in this case, complications from PIH, including but not limited to blood clots, pulmonary embolism, and ultimately, death, was in fact sustained. See *e.g., Hamil v. Bashline, supra.*

The evidence justified a finding of causal relationship between the corporate negligence of defendant, Episcopal Hospital, and the death of plaintiffs' decedent.

Accordingly, there is no error in this case.