J-A08012-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| CATHERINE CHASE, EXECUTRIX OF THE ESTATE OF THELMA JENKINS, DECEASED, | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : : : : | |
| v. | : : | |
| | : | No. 2254 EDA 2019 |
| ADULT DAY SERVICES AND MED TRANSIT LLC | | |
| v. | | |
| DRENA SCOTT AND HANDS FROM THE HEART MANAGEMENT INC. D/B/A/ HANDS FROM THE HEART HOME HEALTHCARE SERVICES | | |

Appeal from the Judgment Entered October 9, 2019
In the Court of Common Pleas of Philadelphia County Civil Division at No(s):
January term, 2017 No. 04592

BEFORE:  LAZARUS, J., KUNSELMAN, J., and McCAFFERY, J.

DISSENTING MEMORANDUM BY McCAFFERY, J.:   **FILED AUGUST 03, 2020**

Appellant Catherine Chase, Executrix of the Estate of Thelma Jenkins, Deceased, submitted evidence (sufficient, if credited by the factfinder) to show that on April 19, 2016, her elderly and disabled great aunt, Thelma Jenkins, left her care in the morning and was transported to Adult Day Services by Med Transit, and that when she left her health was stable.  When Ms. Jenkins returned at the end of the day, she had incurred significant injuries that required a multi-day hospital stay and extended care to address.  There are

two possible scenarios, barring *deus ex machina*: either someone saw what happened to Ms. Jenkins and covered it up, or something happened to Ms. Jenkins – a slight, elderly woman with dementia who used a wheelchair for mobility – something that generated enough force to break both her tibia and fibula, while also hitting her head hard enough to bruise it and cause it to bleed, and **nobody entrusted with her care noticed it at all**.

For these reasons and those I elaborate below, I would conclude that the trial court should have allowed this matter to reach its natural conclusion in a jury verdict, as there was sufficient evidence to reach one and the weight to be afforded that evidence is for the factfinder to determine. Accordingly, I would hold that the trial court erred in denying Appellant's motion to remove the non-suit in favor of Appellees Adult Day Services and Med Transit LLC (Med Transit). Thus, I respectfully dissent.

To make her case, Appellant had to establish a duty of care, breach of that duty, resultant injury, and the suffering of actual loss or damage. Majority Memorandum at 5, *citing* **Brezenski v. World Truck Transfer Inc.**, 755 A.2d 36, 40 (Pa. Super. 2000). The trial court concludes, in its opinion, that Appellant "presented no factual evidence for the period between [Appellant's] departure for work, and Ms. Jenkins' return home." Trial Ct. Op., 11/12/19, at 4.[1] **Id.** This is plainly untrue.

---

[1] I also note that, in describing what it characterizes as a "dearth of evidence" of breach of a standard of care, the Majority states in a footnote that

Initially, I note that our courts have always applied a definition of evidence that is very broad. Pa.R.E. 401 directs that "relevant evidence" is evidence having "**any tendency** to make a fact more or less probable than it would be without the evidence." Pa.R.E. 401(a) (emphasis added). Thus, I am always struck when an assertion is made that there is "no evidence" to support a case, as it seems that this would seldom be true, especially where a case was before a jury, having survived presumably vigorous pretrial litigation.

The fact that Ms. Jenkins had two broken bones in her leg and a bruised, bloodied head is relevant evidence as to what happened to her. Appellant also established that she incurred these injuries while in the care of Appellees, as she was healthy when they accepted her into their care and custody on the morning of April 19, 2019 – that is evidence as to when the injuries occurred. The level of bleeding when she arrived home is also evidence as to when the injuries occurred. The level of swelling when she was seen at the hospital is evidence as to when they occurred. The fact that she was still in pain when she was seen at the hospital, and that the doctors forewent certain diagnostic

---

"[Appellant's] counsel conceded that the doctrine of *res ipsa loquitur* was inapplicable to this case." Majority Memorandum at 8 & n.1. I feel that we must be careful to interpret notes of testimony in context and without overbreadth, especially when applying waiver doctrine or similarly placing off-limits strategies or defenses that might otherwise be available. I would not interpret counsel's comment as a total waiver of the possibility that the jury could infer a breach from circumstantial evidence.

tools because she was in pain and they did not want to exacerbate her discomfort[2] is evidence not only relevant to the time when she incurred her injuries but as to what she must have been experiencing while nothing was done to address her injuries:  in a word, pain.  The fact that Appellees have not been more forthcoming, and that the injured party suffered from dementia and could not recount the exact circumstances under which she was injured and then allowed to suffer as her injuries went unaddressed, should not inure to their benefit in avoiding a jury verdict.

In **Snoparsky v. Baer**, 266 A.2d 707 (Pa. 1970), our Supreme Court adopted the theory known as alternative liability, as outlined in **Summers v. Tice**, 199 P.2d 1 (Cal. 1948), and Section 433B(3) of the Restatement (Second) of Torts.  In **Snoparsky**, the plaintiff was struck by a rock thrown by one of the defendants, and was thereby injured.  **Snoparsky**, 266 A.2d at 708.  In adopting the theory of liability from **Summers** and Section 433B(3), our Supreme Court approved allowing a jury to weigh the potential liability of two or more tortious actors where there is uncertainty as to which one caused the harm.  **Id.** at 709.  "'[T]he particular force and justice of the rule [of burden-shifting] consists in the circumstance that the chief evidence of the true cause, whether culpable or innocent, is practically accessible to him but

---

[2] **See** N.T., 4/1/19, at 61; N.T., 4/2/19, at 152.

inaccessible to the injured person.'" **Summers**, 199 P.2d at 4, *quoting* **Ybarra v. Spangard**, 154 P.2d 687, 689 (Cal. 1944).

Section 433B(3) of the Restatement (Second) of Torts directs that "[w]here the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm." Restatement (Second) of Torts § 433B (1965). The comment to that section specifies that it is intended to address "the injustice of permitting proved wrongdoers, who among them have inflicted an injury upon the entirely innocent plaintiff, to escape liability merely because the nature of their conduct and the resulting harm has made it difficult or impossible to prove which of them has caused the harm." **Id.** at cmt. F. Surely the injustice is even greater where only a tortfeasor could possibly know what happened to the innocent plaintiff, and their silence can be explained only by negligence or a desire to avoid liability.

Circumstantial evidence alone may be sufficient, if believed by a jury, to prove a case of negligence.[3] We have an instruction to communicate this to a jury, and it reads as follows:

---

[3] Indeed, it has long been recognized that even in criminal cases where the more stringent "beyond a reasonable doubt" standard applies, the prosecution "may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence." **Commonwealth v. Harper**, 403 A.2d 536, 538 (Pa. 1979) (citations omitted); **see also Commonwealth v. Greenlee**, 212 A.3d 1038, 1042 (Pa.

As I told you before, you should consider both direct evidence and circumstantial evidence. You may find [defendant] negligent if [plaintiff] has proven the following:

1. This kind of accident, harm, or injury ordinarily does not occur unless someone has been negligent;

2. The conduct of persons other than defendant, including the conduct of plaintiff and third persons, did not cause the accident, harm, or injury; and

3. Only defendant controlled or shared control of the [situation or instrumentality] when the accident, harm, or injury occurred.
You may consider the general knowledge of the community and all evidence presented.

Pa. SSJI (Civ.) § 13.30 (4th ed. 2011) (some brackets and bracketed phrases

omitted).[4]  In **Quinby v. Plumsteadville Family Practice, Inc.**, 907 A.2d

---

Super. 2019).  Surely, we do not provide more staunch defenses to liability for corporate civil defendants than those afforded to criminal defendants.

[4] The trial record reflects that Appellees had ample notice that the central theory of Appellant's case was that the jury should be able to infer based on circumstantial evidence that they had been negligent. **See, e.g.**, N.T., 3/28/19, at 9-10, 18-21, and 41; N.T., 4/2/19, at 178-180. Crucially, the doctrine of *res ipsa loquitur* is not a substantive plank upon which to construct a count of one's complaint; "*res ipsa loquitur* is neither a rule of procedure nor one of substantive tort law . . . it [is] only a shorthand expression for circumstantial proof of negligence — a rule of evidence." **Jones v. Harrisburg Polyclinic Hosp.**, 437 A.2d 1134, 1137 (Pa. 1981), *citing* **Gilbert v. Korvette, Inc.**, 327 A.2d 94, 99 (Pa. 1974).  Confusion as to the exact nature of *res ipsa loquitur* has dogged case law for as long as Pennsylvania has applied this section of the Restatement; in **Gilbert**, our Supreme Court adopted the section on *res ipsa loquitur* and, in doing so, quoted the learned Dean Prosser, who wrote that the doctrine has become "the source of so much trouble to the courts that the use of the phrase itself has become a definite obstacle to any clear thought, and it might better be discarded entirely." **Gilbert**, 327 A.2d at 97, *quoting* W. Prosser, Handbook of the Law of Torts § 39, at 213 (4th ed. 1971); **see also Scampone v.**

1061 (Pa. 2006), our Supreme Court approved entry of judgment notwithstanding the verdict in favor of a plaintiff as to negligence in a wrongful death action where the decedent, a quadriplegic, was found on the floor next to an examination table upon which he had been left. *Id.* at 1073. There, as here, the plaintiff submitted no direct evidence as to what happened during the actual period in which the plaintiff was injured. *Id.* The Court determined first that "the event is of a kind which ordinarily does not occur in the absence of negligence" per Restatement (Second) Torts § 328D(1)(a). *Id.* at 1072. Then the Court held that outside causes such as table failure or seismic disturbance could be eliminated, and that therefore only the defendants' negligence could account for the decedent's injuries.[5] *Id.* at 1073. What happened to the plaintiff, there as here, is "not the type of event that occurs in the absence of negligence . . . ." *Id.* Finally, the indicated negligence was within the scope of the defendants' duty. *Id.* at 1072.[6]

---

*Highland Park Care Ctr., LLC*, 57 A.3d 582, 606 (Pa. 2012) (*citing Gilbert*; "The principal point is that evidentiary considerations should not be mistaken for the question of substantive duty.)".

[5] "Indeed, his condition made it impossible for him to even understand how or why he fell." *Quinby*, 907 A.2d at 1073. Here, as well, *Quinby* is very similar to the present matter.

[6] Unlike the facts before us, the parties in *Quinby* agreed that the defendants rendered prompt care to address the injuries the plaintiff suffered during the time he was unattended. *Id.* at 1066.

The plaintiff in **Quinby** has a markedly similar evidentiary situation to the one that the present case poses: a party is entrusted entirely to the care of others; that party is incapable both of caring for themselves and of reporting what has happened to them. Plaintiffs in both cases cannot say exactly how the decedents' injuries were incurred. There is circumstantial (but not direct) evidence as to the timing of those injuries. Whether the circumstantial evidence of timing of injury allows one to say precisely when the injuries were suffered is a matter of weight of that evidence; in both cases the evidence establishes unequivocally that the injuries occurred during a time when the decedents were in the care of the defendants. **Quinby** and the present matter have a more precise timeline than most cases involving dehydration and bedsores.

Given the testimony that the blood on Ms. Jenkins' head was still relatively fresh, the jury had evidence indicating that her head injuries were likely no more than an hour or two old.[7] At the same time, the blood had stopped flowing and had begun to dry, thus establishing that the head injuries were not entirely fresh. The jury saw a picture of Ms. Jenkins' head taken with a cellular phone shortly after Ms. Jenkins arrived at home.[8] The jury also

---

[7] **See** N.T., 4/1/19, at 10-12.

[8] **See id.**

saw a picture of her swollen leg taken at the hospital.[9]  The jury heard testimony that Ms. Jenkins was squirming in pain and grimacing while she was at the hospital, awaiting treatment.[10]  The jury also knew the location of Ms. Jenkins' home, as well as the location of Adult Day Services.  This evidence is enough to allow the jury to reach a conclusion as to the likely timeline.

Our Supreme Court has allowed verdicts based on circumstantial evidence, for reasons including that conspiracies of silence might otherwise permit grave injustices.  **See Jones**, 437 A.2d at 1138 (plaintiffs in medical malpractice cases may proceed without direct medical evidence if it is within lay knowledge or established by an expert that the event would not have occurred absent negligence).  **Jones** involved several surgeons who performed three procedures consecutively on the plaintiff.  **Id.** at 1135-36.  Upon awakening, the plaintiff was found to be suffering from nerve palsy.  **Id.** at 1136.  The plaintiff won her case, but this Court granted the defendants a new trial.  **Id.** at 1135-36.  Our Supreme Court reversed, finding that this Court's reasoning "leads into the fallacy that where the injury may be the responsibility of more than one party, the plaintiff must eliminate the 'responsible cause' of one in order for the requirements of [S]ection 328D(1)(b) to be met as to the other."  **Id.** at 1140 (footnote omitted).  **Jones**

---

[9] **See id.** at 20.

[10] **See id.** at 19.

also clarified that the responsibility of the defendants arose not only from a duty not to inflict nerve palsy via poor positioning of an unconscious patient during surgery, but also from an ongoing duty to monitor the patient, even as she was operated on by other surgeons. *Id.* at 1140-41.

Likewise, in this case, both Appellees have a duty not only to keep a vulnerable person from being seriously injured, but to monitor their health and avoid inflicting suffering by neglect. Where circumstantial evidence is sufficient to establish the elements of a negligence claim, the jury should be permitted to weigh that evidence. *See, e.g., Matthews v. Clarion Hosp.*, 742 A.2d 1111, 1116 (Pa. Super. 1999) (reversing summary judgment where plaintiff who fell from table during surgery submitted nurse expert on standard of care; where injury "is so immediately and directly, or naturally and probably, the result of the accident the connection between them does not depend solely on" expert testimony) (citation omitted); *Sedlitsky v. Pareso*, 582 A.2d 1314, 1318 (Pa. Super. 1990) (remanding for new trial; post-surgery paralysis evidence was sufficient to support *res ipsa* charge, and trial court should have given charge even though plaintiff's request was improper, as it was enough to alert trial judge of need for instruction).

The Majority concludes that Appellant "cannot avail herself of relief under the theory of alternative liability as she has failed to establish negligence on the part of either Med Transit or Adult Day Services." Majority Memorandum at 11. Due to the blatant nature of the harms Ms. Jenkins

suffered, it is impossible for me to conclude that anyone who had willingly (indeed, for money and in their course of business) taken on a duty of care toward her could fulfill that duty while being so negligent as to fail to note or address these grievous wounds, including an actively bleeding head.[11]  I see this case as analogous to **Snoparsky**; each of the children threw rocks in that case, and thus acted in a tortious manner.  Here, there is evidence that each Appellee, at a minimum, failed to note or address Ms. Jenkins' wounds.  Thus, under the theory of alternative liability, the burden should shift to them.  Only if we focus solely on the moment when the injuries were incurred, and ignore any other expression of duty or moment of pain, could we fail to see that this is a classic alternative liability scenario.  The precise moment of injury is not the only moment of potentially tortious conduct for the jury to weigh.

In **Summers**, an individual was struck with two pellets of birdshot when two of his companions fired at quail simultaneously.  **Summers**, 199 P.2d at 1-2.  The Supreme Court of California stated that "[t]he injured party has

---

[11] The implications of allowing the fact that there are two defendants to defeat liability in this scenario elevates the importance of the corporate form such that it would be as valuable as insurance.  Imagine that the two defendants were in fact one organization that offered transport as part of its day care services.  Liability would be clear.  If our courts say categorically that this type of case cannot go to a jury, then such an organization would do well to develop a subsidiary for the transport service, and perhaps for other aspects of its services (meal time, for instance) so that it might avoid liability when a person entrusted to its care is injured.  The corporate entities, as long as they observe a "green wall" of silence, would be difficult to hold to account.  As a matter of policy, this is not good for Pennsylvanians.

- 11 -

been placed by defendants in the unfair position of pointing to which defendant caused the harm. If one can escape the other may also and plaintiff is remediless. Ordinarily defendants are in a far better position to offer evidence to determine which one caused the injury." *Id.* at 4. This is true here, as well. The ***Summers*** Court then discussed a case where "[i]n a quite analogous situation" the Court held that a patient who was injured during a period when they were rendered unconscious on a hospital operating table could proceed against all or any of those who operated on him, though he could not "select the particular acts by the particular person which led to his disability." *Id., citing **Ybarra***, 154 P.2d 687. The present dispute is a core ***Summers*** case.

By the logic of the Majority, ***Ybarra*** was wrongly decided and thus ***Summers*** should not have relied on it, let alone found it to be "quite analogous" to the facts in ***Summers***. The patient in ***Ybarra*** was presumably injured by a single act of medical malpractice – potentially, a single slip of the surgical tool by a single actor. ***See Ybarra***, 154 P.2d at 690. Thus, how could the unconscious patient prove that the conduct of more than one actor has been tortious at all? The present case is stronger than ***Ybarra***, where the injury was slow to manifest itself fully, and in many ways far less apparent than the injuries at issue here.[12]

_____

[12] Our Courts have applied ***Ybarra*** in emphasizing the need to permit circumstantial proof to allow the jury to infer negligence:

I thus return to the fundamentals: duty, breach, resultant injury, and real suffering. No one could contest that Ms. Jenkins was injured and suffered thereby. If we attribute to Appellees merely the bare duty that we all owe one another not to cause grievous injury, only then can we find that **_Ybarra_**, **_Summers_**, and **_Snoparsky_** are not satisfied. How could that be the appropriate duty of care to apply here?

The Restatement has more to say about those who are in the business of caring for vulnerable parties:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

---

"The need for an inference of negligence is especially obvious in the situation where a patient submits himself or herself to the care and custody of doctors and nurses, is rendered unconscious, and receives some injury . . .

> ". . . (W)ithout the aid of the doctrine a patient who received permanent injuries of a serious character, obviously the result of someone's negligence, would be entirely unable to recover unless the doctors and nurses in attendance voluntarily chose to disclose the identity of the negligent person and the facts establishing liability . . . .'"

**_Jones_**, 437 A.2d at 1139, _quoting_ **_Ybarra_**, 154 P.2d at 689.

Restatement (Second) of Torts § 323 (1965). One who undertakes care of a vulnerable person who lacks capacity to keep herself safe has a greater duty than merely to take reasonable steps to prevent falls. Such businesses must also **affirmatively care** for those in their charge. Where such businesses simply shuffle a seriously injured person along to their next stop, allowing them to suffer serious pain from two broken bones and a head injury, I find it hard to believe that a reasonable jury would find that they vindicated that duty.

We must apply the very deferential standard of review that our Supreme Court has outlined. "On appeal, entry of a compulsory nonsuit is affirmed only if no liability exists based on the relevant facts and circumstances, with appellant receiving 'the benefit of every reasonable inference and resolving all evidentiary conflicts in [appellant's] favor.'" **Scampone**, 57 A.3d at 595–96, **quoting Agnew v. Dupler**, 717 A.2d 519, 523 (Pa. 1998). In **Scampone**, our Supreme Court upheld this Court's reversal of nonsuit where a nursing home resident with dementia died of a heart attack after being admitted to a hospital for treatment of dehydration, a urinary tract infection, malnutrition, bedsores, and an acute myocardial infarction. **Id.** at 584. The evidence of neglect, combined with a standard of review preferential to jury verdicts over nonsuit, compelled the Supreme Court to direct the trial court to reassess corporate liability for the corporation providing management services to the nursing home and to certain parties with ownership interest in the nursing

- 14 -

home. *Id.* at 607. Although the decedent was 94 years old when she died, the evidence of neglect was significant and nonsuit was granted only because of the trial court's error in failing to apply corporate negligence doctrine. *Id.*

There was no "fall" in *Scampone*, no one moment of potentially tortious conduct. Instead, as here, there was evidence of negligence that caused prolonged agony for a vulnerable party who had dementia and thus could not advocate for herself or speak up about mistreatment. The level of swelling in Ms. Jenkins' leg, the state of the blood on her head – which was not quite dry but no longer actively dripping – and the evidence about how long it took for her to be transported home paint a sufficient picture to allow a jury to determine approximately when she was injured and how long she was left to suffer. The jury should have been permitted to do so. Even if jurors could not determine exactly how Ms. Jenkins was injured, this evidence was enough to determine approximately how long she was suffering from her injuries. In *Scampone*, the jury had a much more complex temporal picture, with a complicated timeline regarding the urinary tract infection and bedsores. However, in both cases, there is enough evidence of negligence that a jury should – must – be permitted to reach a verdict.

Appellees argue that under *Pennfield Corp. v. Meadow Valley Elec., Inc.*, 604 A.2d 1082 (Pa. Super. 1992), they cannot be held liable because the jury could not reasonably find that they both engaged in tortious behavior, and *Pennfield* clarified alternative liability by holding that only where co-

defendants both committed a tortious act can alternative liability apply.  Adult Day Services' Brief at 21; Med Transit's Brief at 31-32.  Again, they argue essentially that as long as they maintain their wall of silence, Appellant cannot articulate an applicable theory of liability.

In **Pennfield**, a plaintiff whose large herd of swine suffocated due to an electrical malfunction brought a products liability case against several products manufacturers.  **Pennfield**, 604 A.2d at 1083.  **Pennfield** combines the theoretical difficulties of the famous "Blue Bus problem" that so many first-year law students explore in torts with the unique issues of products liability.[13]  Thus, the appellant in **Pennfield** made arguments sounding in market share and the like.  **Id.** at 1086.  **Pennfield** disallows alternative liability's burden-shifting where the plaintiff explicitly alleges that either one third-party defendant or the other third-party defendant was responsible for the injuries at issue.  **Id.** at 1083.  Here, Appellant has alleged that both Appellees were negligent, and that Ms. Jenkins suffered harm thereby.  This Court characterized **Pennfield** as "a far cry" from **Summers**.  **Id.** at 1086.

I do not think the present matter lies so far, given its proximity to **Ybarra**.  First, **this is not a products liability case**.  Second, crucially, there is enough evidence for a jury to conclude that Ms. Jenkins was injured while

---

[13] For more on the Blue Bus problem, see Edward K. Cheng, Reconceptualizing the Burden of Proof, 122 Yale L.J. (2013), available at http://digitalcommons.law.yale.edu/ylj/vol122/iss5/3.

in Appellees' custody, and the nature of her bleeding, swelling (especially the swelling around her lower leg, broken tibia, and fibula), and pain when she returned to her home and was then examined at the hospital, allows the jury to reach a reasonable conclusion as to when she was injured. The **_Pennfield_** defendants simply did not have the kind of relationship to the injured party as Appellees had to Ms. Jenkins. Some of the **_Pennfield_** defendants were not even involved in the case at all — it was only speculation about market share that brought them into the litigation. That is a far cry from a case where two businesses who put themselves out in Pennsylvania's market as being sufficiently competent to care for a disabled and vulnerable senior suffering from dementia, who took money in exchange for taking on the responsibility for her care, and who now claim, with no apparent shame, to know nothing about how she broke two bones and split her head open while they were being paid to safeguard and care for her.

It is for the jury to decide whether Appellant has established that both Appellees, Adult Day Services and Med Transit, are culpable for negligently allowing Ms. Jenkins to suffer and bleed with no succor or treatment. If they agree that this is so, then they may move to the question of whether Appellees have disproven causation. Appellant pled a case that included pain and suffering, and if the jurors conclude that Appellees were negligent in caring for Ms. Jenkins, and her prolonged pain and suffering resulted from that negligence, they should be permitted to do so.

Appellees make much of the fact that Appellant cannot establish, either through her own testimony or through expert testimony, how exactly Ms. Jenkins was injured. This argument is one that only a lawyer could love. The truth it necessarily highlights is that every time Appellees assert that Appellant cannot say what happened, the mind naturally retorts, "But somebody can, and if they can't, then what where they doing when they were supposed to be caring for Thelma Jenkins?" Appellant was aware that Ms. Jenkins needed constant care and supervision, which is why she hired Appellees to provide it. They accepted money to do so, and now, when asked "What happened?" they produce nothing but a collective shrug. I believe our laws demand more.

Thus, I respectfully dissent.